1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

                          ----oo0oo----

11

12  DALE M. WALLIS, D.V.M., JAMES        NO. CIV. 08-02558 WBS GGH
    L. WALLIS, and HYGIEIA
13  BIOLOGICAL LABORATORIES, INC.,
    a California Corporation,            MEMORANDUM AND ORDER RE: MOTION
14                                       TO DISMISS

                 Plaintiffs,
15
          v.
16
    CENTENNIAL INSURANCE COMPANY,
17  INC., a New York corporation,
    and ATLANTIC MUTUAL INSURANCE,
18  CO., INC., a New York
    corporation,
19
                 Defendants,
20  _____/

21  AND RELATED COUNTERCLAIMS AND
    THIRD-PARTY COMPLAINT.
22  _____/

23
                          ----oo0oo----
24

25          Plaintiffs Dale M. Wallis ("Dr. Wallis"), James L.

26  Wallis ("Mr. Wallis"), and Hygieia Biological Laboratories Inc.

27  ("Hygieia") brought this action against defendants Centennial

28  Insurance Company Inc. ("Centennial") and Atlantic Mutual

                                1

1  Insurance Co., Inc. ("Atlantic Mutual") arising from plaintiffs'

2  veterinarian professional liability insurance policy.  Defendants

3  now move to dismiss plaintiffs' claims against Atlantic Mutual

4  and plaintiffs' declaratory judgment claim against both

5  defendants pursuant to Federal Rule of Civil Procedure 12(b)(6)

6  for failure to state a claim upon which relief can be granted.

7  I.   Factual and Procedural Background

8          The factual background of this case is set forth

9  indetail in the court's February 28, 2013 Order granting

10 defendants' motion for judgment on the pleadings.  (Feb. 28, 2013

11 Order (Docket No. 212).)  Generally, plaintiffs allege that

12 Centennial issued a policy of professional liability insurance to

13 Dr. Wallis, which also covered Mr. Wallis and Hygieia.  (First

14 Am. Compl. ("FAC") ¶ 15, Exs. A, B (Docket No. 217).)  Plaintiffs

15 filed this suit after a dispute arose over defendants' defense of

16 plaintiffs in an underlying lawsuit in state court.  (Id. ¶¶ 26-

17 30.)

18          Plaintiffs' original complaint failed to allege

19 sufficient facts to support a theory to hold Atlantic Mutual, a

20 non-signatory to the insurance policy between plaintiffs and

21 Centennial, liable for breach of contract or breach of the

22 implied covenant of good faith and fair dealing.  (Feb. 28, 2013

23 Order at 11:9-13:10.)  The court dismissed plaintiffs' claims

24 against Atlantic Mutual with leave to amend in order to give

25 plaintiffs an opportunity to allege facts sufficient to support

26 such a theory.  (Id. at 13:19-23.)

27          Plaintiffs now allege that the brochures related to the

28 professional liability insurance Dr. Wallis purchased referred

2

only to Centennial and that her policy issued from Centennial as
a member of the "Atlantic Mutual Companies." (FAC ¶ 9.)  They
further allege that although Dr. Wallis was the named insured
under the policy since 1988, she did not learn that her insurance
carrier was actually Atlantic Mutual until she received a letter
in June 2004 regarding the cancellation of her policy. (Id.  ¶¶
9, 15.)  The letter advised her that "the insurance carrier,
Atlantic Mutual, has declined to offer coverage . . . ." (Id. ¶
9.)  Plaintiffs now allege that Centennial is a wholly owned
subsidiary of Atlantic Mutual. (Id. ¶ 8.)

        Plaintiffs next allege that when Dr. Wallis tendered
her defense of the underlying lawsuit, defendants requested that
the tender be sent to an Atlantic Mutual "Claims Representative."
(Id. ¶ 10(a).)  When Dr. Wallis received a letter in response to
her tender, the letter came on "Atlantic Mutual Companies"
letterhead, which listed both Atlantic Mutual and Centennial.
(Id. ¶ 10(b).)  This letter indicated that Centennial was the
company accepting the initial tender of the defense. (Id.)  Each
employee that handled the defense of the underlying lawsuit,
however, was employed by Atlantic Mutual. (Id. ¶ 10(c).)
Plaintiffs allege that no employee of Centennial ever handled
their claim and that plaintiffs' Cumis counsel were advised to
direct all correspondence and bills to Atlantic Mutual rather
than Centennial. (Id.)  Defendants further advised plaintiffs'
Cumis counsel that they were required to follow billing
guidelines issued by Atlantic Mutual. (Id. ¶ 10(f).)

        Dr. Wallis received a letter in 2002, on the same
letterhead described above, stating that "Centennial is defending

3

1  . . . under strict reservation of rights."  (<u>Id.</u> ¶ 10(g).)   In

2  the tentative settlement agreement reached the following year in

3  the underlying lawsuit, however, the agreement had to be signed

4  by Atlantic Mutual and was signed by an attorney on behalf of

5  Atlantic Mutual.  (<u>Id.</u> ¶ 10(h).)

6         In March 2003, defendants obtained attorney Gary Selvin

7  on behalf of both Atlantic Mutual and Centennial.  (<u>Id.</u> ¶ 10(i).)

8  Plaintiffs allege that he also "began to take on the role as an

9  agent and/or adjuster for the defendants."  (<u>Id.</u>)  Selvin wrote

10  two letters concerning the settlement that allegedly indicate

11  that Atlantic Mutual is the insurer holding the policy.  (<u>Id.</u>)

12  Two months later, in July 2003, plaintiffs' <u>Cumis</u> counsel

13  received a letter stating that Atlantic Mutual is the insurance

14  company "provid[ing] Dr. Wallis with a defense."  (<u>Id.</u> ¶ 10(j).)

15  The letter is signed by an Atlantic Mutual employee.  (<u>Id.</u>)

16         Several letters from Selvin in 2007 again indicated

17  that Atlantic Mutual was the insurer obligated to pay for

18  plaintiffs' defense under California Civil Code section 2860.

19  (<u>Id.</u> ¶ 10(k)-(l).)  In another letter from November that same

20  year, plaintiffs allege that Selvin acknowledged "on behalf of

21  Atlantic Mutual" that because Atlantic Mutual is the company

22  obligated to pay for plaintiffs' defense, "it owed a duty to pay

23  the cost of premiums for bonds on appeal."  (<u>Id.</u> ¶ 10(m).)

24  Letters from Selvin from early 2008 until July 2009 sometimes

25  suggested that Atlantic Mutual was the party bound by plaintiffs'

26  insurance policy and other times that Centennial was.  (<u>See</u> ¶¶

27  10(n)-(q).)

28         Plaintiffs further allege that Atlantic Mutual employed

4

auditors who imposed Atlantic Mutual's billing guidelines on the invoices submitted by plaintiffs' <u>Cumis</u> counsel for their work in the state lawsuit. (<u>Id.</u> ¶ 10(r).) They also allege that both Centennial and Atlantic Mutual executed judicial admissions in an earlier action before this court acknowledging that plaintiffs are the insureds of both Centennial and Atlantic Mutual. (<u>Id.</u> ¶ 12.)

Plaintiffs also allege that Atlantic Mutual and Centennial had the same officers and directors, home office, mailing address, bank account, telephone numbers, and location of books and records. (<u>Id.</u> ¶ 8.) They further allege that Atlantic Mutual and Centennial utilize a shared bank account. (<u>Id.</u> ¶ 10(e).) In support of this proposition, plaintiffs allege that all checks issued for payment of attorneys' fees and other vendor costs associated with the underlying state lawsuit came from one bank account and that the checks identified both Atlantic Mutual and Centennial as entities on the account. (<u>Id.</u>)

In sum, plaintiffs now allege that Centennial was the agent of Atlantic Mutual and Atlantic Mutual was Centennial's undisclosed principal. (<u>Id.</u> ¶ 6.) They allege that Atlantic Mutual exercised pervasive, continual, and exclusive control over Centennial and that it made all decisions and took all actions with regard to the defense of plaintiffs' underlying lawsuit, either as the principal or together with Centennial. (<u>Id.</u> ¶¶ 8, 11.) Alternatively, they allege that Atlantic Mutual is the alter ego of Centennial and that the corporations failed to respect their purported corporate separateness. (<u>Id.</u> ¶¶ 6, 13.)

Presently before the court is defendants' motion to

dismiss plaintiffs' claims against Atlantic Mutual pursuant to Rule 12(b)(6).  Defendants also request dismissal of plaintiffs' claim for declaratory judgment against both defendants.

II.  Legal Standard

    To survive a motion to dismiss, a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  This "plausibility standard," however, "asks for more than a sheer possibility that a defendant has acted unlawfully," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557).  In deciding whether a plaintiff has stated a claim, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984); Cruz v. Beto, 405 U.S. 319, 322 (1972).

III.  Analysis

    A.   Breach of Contract and Breach of the Implied Covenant
         of Good Faith and Fair Dealing

    Courts have allowed plaintiffs to proceed on breach of contract and breach of the implied covenant of good faith and fair dealing claims against non-signatories to a contract on the basis of both agency and alter ego theories.  See, e.g., Axon Solutions, Inc. v. San Diego Data Processing Corp., 09 CV 2543 JM

1   RBB, 2010 WL 1797028 (S.D. Cal. May 4, 2010); <u>Dion LLC v. Infotek</u>

2   <u>Wireless, Inc.</u>, C 07-1431SBA, 2007 WL 3231738 (N.D. Cal. Oct. 30,

3   2007); <u>Monaco v. Liberty Life Assur. Co.</u>, C06-07021 MJJ, 2007 WL

4   1140460 (N.D. Cal. Apr. 17, 2007).  Particularly, the court has

5   noted in this case that where an agent makes a contract on behalf

6   of an undisclosed principal, the principal is a party to that

7   contract.  <u>See</u> <u>Ikerd v. Warren T. Merrill & Sons</u>, 9 Cal. App. 4th

8   1833, 1839 n.6 (2d Dist. 1992) ("A contract made by an agent for

9   an undisclosed principal is for most purposes the contract of the

10  principal and it may sue or be sued thereon."); Restatement

11  (Third) Of Agency § 6.03(1)-(2) (2006).

12          If defendants so request, however, plaintiffs may

13  ultimately be required--if they proceed on their agency theory--

14  to elect to proceed against either Atlantic Mutual or Centennial.

15  <u>See</u> <u>Ikerd</u>, 9 Cal. App. 4th at 1839 n.6 (where contract made by

16  agent for undisclosed principal, "the contracting third party may

17  sue <u>either</u> the agent or the principal, but he can not sue <u>both</u>"

18  (internal citations omitted)); <u>Standard Oil Co. of Cal. v.</u>

19  <u>Doneux</u>, 192 Cal. App. 2d 608, 611 (3d Dist. 1961) ("The basic

20  rule is that an undisclosed principal when discovered is liable

21  for the authorized contracts of his agent.  But there is a

22  corollary to this rule.  Once the third party has discovered that

23  there is an undisclosed principal he may be required to hold

24  either the agent or the principal [liable], for the liability is

25  alternative." (internal citation omitted)); <u>id.</u> at 612 ("[T]he

26  plaintiff cannot hold both the agent and the undisclosed

27  principal and must upon demand of the principal or the agent

28  elect which he will hold.").

1        1.   Agency

2        Under California law, an agent is defined as "one who
3   represents another, called the principal, in dealings with third
4   persons."  Cal. Civ. Code § 2295.  To establish liability under
5   an agency theory when the purported principal and agent have a
6   parent-subsidiary relationship, plaintiffs "must show more than
7   mere representation of the parent by the subsidiary in dealings
8   with third persons."  Laird v. Capital Cities/ABC, Inc., 68 Cal.
9   App. 4th 727, 741 (3d Dist. 1998).  "The control exercised in a
10  typical parent-subsidiary relationship is insufficient to create
11  an agency relationship."  Van Maanen v. Youth With a
12  Mission-Bishop, 852 F. Supp. 2d 1232, 1249 (E.D. Cal. 2012)
13  (England, J.).  Rather, "[t]he showing required is that 'a parent
14  corporation so controls the subsidiary as to cause the subsidiary
15  to become merely the agent or instrumentality of the parent[.]'"
16  Laird, 68 Cal. App. 4th at 741 (quoting Linskey v. Heidelberg E.,
17  Inc., 470 F. Supp. 1181, 1184 (E.D.N.Y. 1979)) (alteration in
18  original).  "[T]he parent must be shown to have moved beyond the
19  establishment of general policy and direction for the subsidiary
20  and in effect taken over performance of the subsidiary's
21  day-to-day operations in carrying out that policy."  Sonora
22  Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 541 (5th
23  Dist. 2000); see id. (control must be "so pervasive and continual
24  that the subsidiary may be considered nothing more than an agent
25  or instrumentality of the parent, notwithstanding the maintenance
26  of separate corporate formalities").

27        Contrary to defendants' characterization of plaintiffs'
28  allegations, plaintiffs do more than recite mere conclusory

8

allegations of agency.  They allege facts suggesting that
Atlantic Mutual's control over Centennial was so "pervasive and
continual" that Centennial was no more than the instrumentality
of Atlantic Mutual.  Sonora Diamond, 83 Cal. App. 4th at 541.
Plaintiffs allege that once Centennial issued the policy,
Atlantic Mutual assumed responsibility for almost everything else
related to defense of the underlying state lawsuit, such as
corresponding with plaintiffs and Cumis counsel, paying for
plaintiffs' defense, and handling the administration of
plaintiffs' claim.  While Atlantic Mutual's imposition of billing
guidelines might be the kind of general policy decision that does
not indicate agency, see id. at 542, its other acts appear to be
the quotidian responsibilities that an insurer, like Centennial,
would normally complete.  Atlantic Mutual's assumption of such
tasks suggests that it had more than the usual oversight and
control that a parent has over a subsidiary.  See id. at 541.

Defendants do not address these particular allegations.
Instead of focusing on whether plaintiffs' allegations are
sufficient to avoid dismissal, they wrongly rely on cases
evaluating whether the plaintiffs offered sufficient evidence of
an agency relationship for the court to grant summary judgment or
exercise jurisdiction over a defendant.  See, e.g., F. Hoffman-La
Roche, Inc. v. Superior Court, 130 Cal. App. 4th 782, 799-803
(6th Dist. 2005); Sonora Diamond Corp., 83 Cal. App. 4th at 548-
51; Laird, 68 Cal. App. 4th at 741.  Whether or not plaintiffs
may ultimately be able to prove their allegations and offer
sufficient evidence of agency, they have alleged sufficient facts
to suggest that Atlantic Mutual exercised such extensive control

over Centennial that Centennial was no more than its agent.  Cf.
Higley v. Cessna Aircraft Co., CV 10-3345 GHK FMO, 2010 WL
3184516, at *2-3 (C.D. Cal. July 21, 2010) (plaintiffs'
allegations insufficient to support agency theory where
plaintiffs alleged that subsidiary was wholly owned by parent, at
least one director on parent's board also served on subsidiary's
board, and because parent owned 100% of the stock of subsidiary,
the parent thereby controlled the subsidiary).

> 2.  Alter Ego

     "The alter ego doctrine arises when a plaintiff comes
into court claiming that an opposing party is using the corporate
form unjustly and in derogation of the plaintiff's interests."
Mesler v. Bragg Mgmt. Co., 39 Cal. 3d 290, 300 (1985).  Under the
doctrine, "[a] corporate identity may be disregarded--the
'corporate veil' pierced--where an abuse of the corporate
privilege justifies holding the equitable ownership of a
corporation liable for the actions of the corporation."  Sonora
Diamond, 83 Cal. App. 4th at 538.  "[C]ourts will ignore the
corporate entity and deem the corporation's acts to be those of
the persons or organizations actually controlling the
corporation" "when the corporate form is used to perpetrate a
fraud, circumvent a statute, or accomplish some other wrongful or
inequitable purpose."  Id.

     The doctrine may be invoked when two conditions are
met: (1) there is such a unity of interest and ownership that the
separate corporations are merged, so that one corporation is a
mere adjunct of another or the two companies form a single
enterprise; and (2) there will be an inequitable result if the

1  acts in question are treated as those of one corporation alone.

2  <u>Tran v. Farmers Grp., Inc.</u>, 104 Cal. App. 4th 1202, 1219 (1st

3  Dist. 2002); <u>Sonora Diamond</u>, 83 Cal. App. 4th at 538.  "To put it

4  in other terms, the plaintiff must show specific manipulative

5  conduct by the parent toward the subsidiary which relegate[s] the

6  latter to the status of merely an instrumentality, agency,

7  conduit or adjunct of the former[.]"  <u>Laird</u>, 68 Cal. App. 4th at

8  742 (first alteration in original) (internal quotation marks and

9  citations omitted).

10               a.   <u>Unity of Interest</u>

11          For the unity of interest element, courts consider

12  several factors, including:

13      inadequate capitalization, commingling of funds and other
        assets of the two entities, the holding out by one entity
14      that it is liable for the debts of the other, identical
        equitable ownership in the two entities, use of the same
15      offices and employees, use of one as a mere conduit for
        the affairs of the other, disregard of corporate
16      formalities, lack of segregation of corporate records,
        and identical directors and officers.

17

18  <u>Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.</u>, 99 Cal. App. 4th

19  228, 245 (4th Dist. 2002)

20          Plaintiffs allege a number of facts that are sufficient

21  under California law to question the independence and

22  separateness of Atlantic Mutual and Centennial.  They allege that

23  Centennial and Atlantic Mutual share a bank account; that

24  Atlantic Mutual repeatedly represented itself as obligated to pay

25  for Centennial's obligations under plaintiffs' insurance policy;

26  that while Centennial issued plaintiffs' policy, Atlantic Mutual

27  completed the obligations under it; that Atlantic Mutual and

28  Centennial share common officers and directors; that Atlantic

Mutual and Centennial used the same home office; and that
Atlantic Mutual and Centennial did not respect their purported
corporate separateness.  These factual allegations are more than
the mere "broad and insufficient" allegations of the factors that
courts have found fail to show a unity of interest.  <u>See, e.g.,</u>
<u>Mililani Grp., Inc. v. O'Reilly Auto., Inc.</u>, 2:12-CV-00891 JAM,
2012 WL 5932980, at *2 (E.D. Cal. Nov. 27, 2012) (Mendez, J.).

Defendants cite no case holding that comparable
allegations are insufficient to show a unity of identity.  <u>Cf.</u>
<u>Pac. Mar. Freight, Inc. v. Foster</u>, 10-CV-0578-BTM-BLM, 2010 WL
3339432, at *6 (S.D. Cal. Aug. 24, 2010) (noting that "[t]he
identification of the elements of alter-ego liability plus two or
three factors has been held sufficient to defeat a 12(b)(6)
motion to dismiss").  Cases found by the court support the
proposition that plaintiffs have alleged facts supporting
factors--commingling of funds, the holding out by one entity that
it is liable for the debts of the other, use of one entity as the
mere conduit of the other--that are particularly indicative of a
unity of interest and, where pled, sufficient to avoid dismissal
of a defendant who is alleged to be liable as an alter ego.  <u>See</u>
<u>id.</u> at *7 (unity of interest sufficiently alleged where plaintiff
pled commingling of funds and domination and control of sole
owner over entity); <u>Axon Solutions, Inc.</u>, 2010 WL 1797028, at *3
(unity of interest sufficiently alleged where plaintiff alleged
that city wholly owned company, city deliberately
undercapitalized company, city and company commingled funds, and
city represented that it was liable for company's debts).
Plaintiffs have therefore sufficiently pled the first prong for

12

1  alter ego liability.

2                    b.    Inequitable Result

3       To allege the inequitable result element of the alter

4  ego theory, plaintiffs must allege bad-faith conduct by

5  defendants.  Mid-Century Ins. Co. v. Gardner, 9 Cal. App. 4th

6  1205, 1213 (3d Dist. 1992).  "[T]he kind of inequitable result

7  that makes alter ego liability appropriate is an abuse of the

8  corporate form, such as under-capitalization or misrepresentation

9  of the corporate form to creditors."  Firstmark Capital Corp. v.

10  Hempel Fin. Corp., 859 F.2d 92, 94 (9th Cir. 1988) (internal

11  quotation marks and citations omitted) (applying California law).

12  "[W]hile the doctrine does not depend on the presence of actual

13  fraud, it is designed to prevent what would be fraud or

14  injustice, if accomplished."  Associated Vendors, Inc. v. Oakland

15  Meat Co., 210 Cal. App. 2d 825, 838 (1st Dist. 1962).

16       Plaintiffs allege that "severe injustice would be

17  imposed upon the plaintiffs by recognizing defendants as separate

18  entities, in that defendants would be permitted to create an

19  artifice to promote injustice to avoid bad faith liability to the

20  plaintiffs, whereby Centennial issued the policy, but Atlantic

21  Mutual, which committed and engaged in the many acts [in] bad

22  faith, disclaims responsibility as a non-signatory to the

23  policy."  (FAC ¶ 13(d).)  Plaintiffs thus allege that recognizing

24  separateness between Atlantic Mutual and Centennial would allow

25  Atlantic Mutual to use the corporate form to avoid liability for

26  the harm it allegedly caused to plaintiffs by preventing

27  fulfillment of the obligations due to them under their insurance

28  policy.  Plaintiffs' allegations are therefore sufficient to met

                                  13

1  the inequitable result prong at the pleading stage.  <u>See</u> <u>Axon</u>,

2  2010 WL 1797028, at *3 (finding fact that alter ego could

3  dissolve wholly owned corporation to destroy any remedy available

4  to the plaintiff rose to the level of an inequitable act for

5  purposes of alter ego doctrine at the pleading stage).

6  Accordingly, plaintiffs' claims for breach of contract and breach

7  of the implied covenant of good faith and fair dealing against

8  Atlantic Mutual cannot be dismissed.

9       B.   <u>Declaratory Relief</u>

10      Defendants argue that plaintiffs' claim for declaratory

11 relief should be dismissed because plaintiffs no longer have any

12 basis to seek declaratory relief as to defendants' obligation to

13 pay defense costs and there is no action to which such a

14 prospective duty would apply.  (Mem. in Supp. at 13:20-28 (Docket

15 No. 219-1).)  Plaintiffs did not oppose this argument; they

16 failed to address it all.  Accordingly, plaintiffs' claim for

17 declaratory relief will be dismissed.  <u>See</u> <u>Silva v. U.S. Bancorp</u>,

18 5:10-CV-01854-JHN, 2011 WL 7096576, at *3 (C.D. Cal. Oct. 6,

19 2011) (finding that plaintiff conceded that claim should be

20 dismissed by failing to address defendants' arguments in his

21 opposition).

22      IT IS THEREFORE ORDERED that defendants' motion to

23 dismiss be, and the same hereby is, DENIED IN PART as to

24 plaintiffs' claims for breach of contract and breach of the

25 implied covenant of good faith and fair dealing against Atlantic

26 Mutual and GRANTED IN PART as to plaintiffs' claim for

27 declaratory relief.

28 ///

DATED:   July 19, 2013

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE