UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

DALE M. WALLIS, D.V.M., JAMES
L. WALLIS, and HYGIEIA
BIOLOGICAL LABORATORIES, INC.,
a California Corporation,

        Plaintiffs,

    v.

CENTENNIAL INSURANCE COMPANY,
INC., a New York corporation,
and ATLANTIC MUTUAL INSURANCE,
CO., INC., a New York
corporation,

        Defendants,
_____/

AND RELATED COUNTERCLAIMS AND
THIRD-PARTY COMPLAINT.
_____/

NO. CIV. 08-02558 WBS GGH

MEMORANDUM AND ORDER RE: MOTION
TO DISMISS

----oo0oo----

        Plaintiffs Dale M. Wallis ("Dr. Wallis"), James L.
Wallis ("Mr. Wallis"), and Hygieia Biological Laboratories Inc.
("Hygieia") brought this action against defendants Centennial
Insurance Company Inc. ("Centennial") and Atlantic Mutual

1   Insurance Co., Inc. ("Atlantic Mutual") arising from plaintiffs'

2   veterinarian professional liability insurance policy.  Defendants

3   now move to dismiss plaintiffs' claims against Atlantic Mutual

4   and plaintiffs' declaratory judgment claim against both

5   defendants pursuant to Federal Rule of Civil Procedure 12(b)(6)

6   for failure to state a claim upon which relief can be granted.

7   I.   Factual and Procedural Background

8         The factual background of this case is set forth

9   indetail in the court's February 28, 2013 Order granting

10  defendants' motion for judgment on the pleadings.  (Feb. 28, 2013

11  Order (Docket No. 212).)  Generally, plaintiffs allege that

12  Centennial issued a policy of professional liability insurance to

13  Dr. Wallis, which also covered Mr. Wallis and Hygieia.  (First

14  Am. Compl. ("FAC") ¶ 15, Exs. A, B (Docket No. 217).)  Plaintiffs

15  filed this suit after a dispute arose over defendants' defense of

16  plaintiffs in an underlying lawsuit in state court.  (Id. ¶¶ 26-

17  30.)

18        Plaintiffs' original complaint failed to allege

19  sufficient facts to support a theory to hold Atlantic Mutual, a

20  non-signatory to the insurance policy between plaintiffs and

21  Centennial, liable for breach of contract or breach of the

22  implied covenant of good faith and fair dealing.  (Feb. 28, 2013

23  Order at 11:9-13:10.)  The court dismissed plaintiffs' claims

24  against Atlantic Mutual with leave to amend in order to give

25  plaintiffs an opportunity to allege facts sufficient to support

26  such a theory.  (Id. at 13:19-23.)

27        Plaintiffs now allege that the brochures related to the

28  professional liability insurance Dr. Wallis purchased referred

                                    2

1   only to Centennial and that her policy issued from Centennial as

2   a member of the "Atlantic Mutual Companies." (FAC ¶ 9.)  They

3   further allege that although Dr. Wallis was the named insured

4   under the policy since 1988, she did not learn that her insurance

5   carrier was actually Atlantic Mutual until she received a letter

6   in June 2004 regarding the cancellation of her policy. (Id. ¶¶

7   9, 15.)  The letter advised her that "the insurance carrier,

8   Atlantic Mutual, has declined to offer coverage . . . ." (Id. ¶

9   9.)  Plaintiffs now allege that Centennial is a wholly owned

10  subsidiary of Atlantic Mutual. (Id. ¶ 8.)

11          Plaintiffs next allege that when Dr. Wallis tendered

12  her defense of the underlying lawsuit, defendants requested that

13  the tender be sent to an Atlantic Mutual "Claims Representative."

14  (Id. ¶ 10(a).)  When Dr. Wallis received a letter in response to

15  her tender, the letter came on "Atlantic Mutual Companies"

16  letterhead, which listed both Atlantic Mutual and Centennial.

17  (Id. ¶ 10(b).)  This letter indicated that Centennial was the

18  company accepting the initial tender of the defense. (Id.)  Each

19  employee that handled the defense of the underlying lawsuit,

20  however, was employed by Atlantic Mutual. (Id. ¶ 10(c).)

21  Plaintiffs allege that no employee of Centennial ever handled

22  their claim and that plaintiffs' Cumis counsel were advised to

23  direct all correspondence and bills to Atlantic Mutual rather

24  than Centennial. (Id.)  Defendants further advised plaintiffs'

25  Cumis counsel that they were required to follow billing

26  guidelines issued by Atlantic Mutual. (Id. ¶ 10(f).)

27          Dr. Wallis received a letter in 2002, on the same

28  letterhead described above, stating that "Centennial is defending

3

1  . . . under strict reservation of rights."  (<u>Id.</u> ¶ 10(g).)  In

2  the tentative settlement agreement reached the following year in

3  the underlying lawsuit, however, the agreement had to be signed

4  by Atlantic Mutual and was signed by an attorney on behalf of

5  Atlantic Mutual.  (<u>Id.</u> ¶ 10(h).)

6          In March 2003, defendants obtained attorney Gary Selvin

7  on behalf of both Atlantic Mutual and Centennial.  (<u>Id.</u> ¶ 10(i).)

8  Plaintiffs allege that he also "began to take on the role as an

9  agent and/or adjuster for the defendants."  (<u>Id.</u>)  Selvin wrote

10 two letters concerning the settlement that allegedly indicate

11 that Atlantic Mutual is the insurer holding the policy.  (<u>Id.</u>)

12 Two months later, in July 2003, plaintiffs' <u>Cumis</u> counsel

13 received a letter stating that Atlantic Mutual is the insurance

14 company "provid[ing] Dr. Wallis with a defense."  (<u>Id.</u> ¶ 10(j).)

15 The letter is signed by an Atlantic Mutual employee.  (<u>Id.</u>)

16         Several letters from Selvin in 2007 again indicated

17 that Atlantic Mutual was the insurer obligated to pay for

18 plaintiffs' defense under California Civil Code section 2860.

19 (<u>Id.</u> ¶ 10(k)-(l).)  In another letter from November that same

20 year, plaintiffs allege that Selvin acknowledged "on behalf of

21 Atlantic Mutual" that because Atlantic Mutual is the company

22 obligated to pay for plaintiffs' defense, "it owed a duty to pay

23 the cost of premiums for bonds on appeal."  (<u>Id.</u> ¶ 10(m).)

24 Letters from Selvin from early 2008 until July 2009 sometimes

25 suggested that Atlantic Mutual was the party bound by plaintiffs'

26 insurance policy and other times that Centennial was.  (<u>See</u> ¶¶

27 10(n)-(q).)

28         Plaintiffs further allege that Atlantic Mutual employed

4

auditors who imposed Atlantic Mutual's billing guidelines on the invoices submitted by plaintiffs' <u>Cumis</u> counsel for their work in the state lawsuit.  (<u>Id.</u> ¶ 10(r).)  They also allege that both Centennial and Atlantic Mutual executed judicial admissions in an earlier action before this court acknowledging that plaintiffs are the insureds of both Centennial and Atlantic Mutual.  (<u>Id.</u> ¶ 12.)

Plaintiffs also allege that Atlantic Mutual and Centennial had the same officers and directors, home office, mailing address, bank account, telephone numbers, and location of books and records.  (<u>Id.</u> ¶ 8.)  They further allege that Atlantic Mutual and Centennial utilize a shared bank account.  (<u>Id.</u> ¶ 10(e).)  In support of this proposition, plaintiffs allege that all checks issued for payment of attorneys' fees and other vendor costs associated with the underlying state lawsuit came from one bank account and that the checks identified both Atlantic Mutual and Centennial as entities on the account.  (<u>Id.</u>)

In sum, plaintiffs now allege that Centennial was the agent of Atlantic Mutual and Atlantic Mutual was Centennial's undisclosed principal.  (<u>Id.</u> ¶ 6.)  They allege that Atlantic Mutual exercised pervasive, continual, and exclusive control over Centennial and that it made all decisions and took all actions with regard to the defense of plaintiffs' underlying lawsuit, either as the principal or together with Centennial.  (<u>Id.</u> ¶¶ 8, 11.)  Alternatively, they allege that Atlantic Mutual is the alter ego of Centennial and that the corporations failed to respect their purported corporate separateness.  (<u>Id.</u> ¶¶ 6, 13.)

Presently before the court is defendants' motion to

1   dismiss plaintiffs' claims against Atlantic Mutual pursuant to

2   Rule 12(b)(6).  Defendants also request dismissal of plaintiffs'

3   claim for declaratory judgment against both defendants.

4   II.  Legal Standard

5        To survive a motion to dismiss, a plaintiff must plead

6   "only enough facts to state a claim to relief that is plausible

7   on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

8   (2007).  This "plausibility standard," however, "asks for more

9   than a sheer possibility that a defendant has acted unlawfully,"

10  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and "[w]here a

11  complaint pleads facts that are 'merely consistent with' a

12  defendant's liability, it 'stops short of the line between

13  possibility and plausibility of entitlement to relief.'"  Id.

14  (quoting Twombly, 550 U.S. at 557).  In deciding whether a

15  plaintiff has stated a claim, the court must accept the

16  allegations in the complaint as true and draw all reasonable

17  inferences in favor of the plaintiff.  Scheuer v. Rhodes, 416

18  U.S. 232, 236 (1974), overruled on other grounds by Davis v.

19  Scherer, 468 U.S. 183 (1984); Cruz v. Beto, 405 U.S. 319, 322

20  (1972).

21  III. Analysis

22       A.   Breach of Contract and Breach of the Implied Covenant

23            of Good Faith and Fair Dealing

24       Courts have allowed plaintiffs to proceed on breach of

25  contract and breach of the implied covenant of good faith and

26  fair dealing claims against non-signatories to a contract on the

27  basis of both agency and alter ego theories.  See, e.g., Axon

28  Solutions, Inc. v. San Diego Data Processing Corp., 09 CV 2543 JM

RBB, 2010 WL 1797028 (S.D. Cal. May 4, 2010); <u>Dion LLC v. Infotek</u>
<u>Wireless, Inc.</u>, C 07-1431SBA, 2007 WL 3231738 (N.D. Cal. Oct. 30,
2007); <u>Monaco v. Liberty Life Assur. Co.</u>, C06-07021 MJJ, 2007 WL
1140460 (N.D. Cal. Apr. 17, 2007).  Particularly, the court has
noted in this case that where an agent makes a contract on behalf
of an undisclosed principal, the principal is a party to that
contract.  <u>See</u> <u>Ikerd v. Warren T. Merrill & Sons</u>, 9 Cal. App. 4th
1833, 1839 n.6 (2d Dist. 1992) ("A contract made by an agent for
an undisclosed principal is for most purposes the contract of the
principal and it may sue or be sued thereon."); Restatement
(Third) Of Agency § 6.03(1)-(2) (2006).

         If defendants so request, however, plaintiffs may
ultimately be required--if they proceed on their agency theory--
to elect to proceed against either Atlantic Mutual or Centennial.
<u>See</u> <u>Ikerd</u>, 9 Cal. App. 4th at 1839 n.6 (where contract made by
agent for undisclosed principal, "the contracting third party may
sue <u>either</u> the agent or the principal, but he can not sue <u>both</u>"
(internal citations omitted)); <u>Standard Oil Co. of Cal. v.</u>
<u>Doneux</u>, 192 Cal. App. 2d 608, 611 (3d Dist. 1961) ("The basic
rule is that an undisclosed principal when discovered is liable
for the authorized contracts of his agent.  But there is a
corollary to this rule.  Once the third party has discovered that
there is an undisclosed principal he may be required to hold
either the agent or the principal [liable], for the liability is
alternative." (internal citation omitted)); <u>id.</u> at 612 ("[T]he
plaintiff cannot hold both the agent and the undisclosed
principal and must upon demand of the principal or the agent
elect which he will hold.").

1        1.   Agency

2            Under California law, an agent is defined as "one who

3   represents another, called the principal, in dealings with third

4   persons."  Cal. Civ. Code § 2295.  To establish liability under

5   an agency theory when the purported principal and agent have a

6   parent-subsidiary relationship, plaintiffs "must show more than

7   mere representation of the parent by the subsidiary in dealings

8   with third persons."  Laird v. Capital Cities/ABC, Inc., 68 Cal.

9   App. 4th 727, 741 (3d Dist. 1998).  "The control exercised in a

10  typical parent-subsidiary relationship is insufficient to create

11  an agency relationship."  Van Maanen v. Youth With a

12  Mission-Bishop, 852 F. Supp. 2d 1232, 1249 (E.D. Cal. 2012)

13  (England, J.).  Rather, "[t]he showing required is that 'a parent

14  corporation so controls the subsidiary as to cause the subsidiary

15  to become merely the agent or instrumentality of the parent[.]'"

16  Laird, 68 Cal. App. 4th at 741 (quoting Linskey v. Heidelberg E.,

17  Inc., 470 F. Supp. 1181, 1184 (E.D.N.Y. 1979)) (alteration in

18  original).  "[T]he parent must be shown to have moved beyond the

19  establishment of general policy and direction for the subsidiary

20  and in effect taken over performance of the subsidiary's

21  day-to-day operations in carrying out that policy."  Sonora

22  Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 541 (5th

23  Dist. 2000); see id. (control must be "so pervasive and continual

24  that the subsidiary may be considered nothing more than an agent

25  or instrumentality of the parent, notwithstanding the maintenance

26  of separate corporate formalities").

27           Contrary to defendants' characterization of plaintiffs'

28  allegations, plaintiffs do more than recite mere conclusory

allegations of agency.  They allege facts suggesting that
Atlantic Mutual's control over Centennial was so "pervasive and
continual" that Centennial was no more than the instrumentality
of Atlantic Mutual.  <u>Sonora Diamond</u>, 83 Cal. App. 4th at 541.
Plaintiffs allege that once Centennial issued the policy,
Atlantic Mutual assumed responsibility for almost everything else
related to defense of the underlying state lawsuit, such as
corresponding with plaintiffs and <u>Cumis</u> counsel, paying for
plaintiffs' defense, and handling the administration of
plaintiffs' claim.  While Atlantic Mutual's imposition of billing
guidelines might be the kind of general policy decision that does
not indicate agency, <u>see</u> <u>id.</u> at 542, its other acts appear to be
the quotidian responsibilities that an insurer, like Centennial,
would normally complete.  Atlantic Mutual's assumption of such
tasks suggests that it had more than the usual oversight and
control that a parent has over a subsidiary.  <u>See</u> <u>id.</u> at 541.

Defendants do not address these particular allegations.
Instead of focusing on whether plaintiffs' allegations are
sufficient to avoid dismissal, they wrongly rely on cases
evaluating whether the plaintiffs offered sufficient evidence of
an agency relationship for the court to grant summary judgment or
exercise jurisdiction over a defendant.  <u>See, e.g.</u>, <u>F. Hoffman-La</u>
<u>Roche, Inc. v. Superior Court</u>, 130 Cal. App. 4th 782, 799-803
(6th Dist. 2005); <u>Sonora Diamond Corp.</u>, 83 Cal. App. 4th at 548-
51; <u>Laird</u>, 68 Cal. App. 4th at 741.  Whether or not plaintiffs
may ultimately be able to prove their allegations and offer
sufficient evidence of agency, they have alleged sufficient facts
to suggest that Atlantic Mutual exercised such extensive control

over Centennial that Centennial was no more than its agent.  Cf.
Higley v. Cessna Aircraft Co., CV 10-3345 GHK FMO, 2010 WL
3184516, at *2-3 (C.D. Cal. July 21, 2010) (plaintiffs'
allegations insufficient to support agency theory where
plaintiffs alleged that subsidiary was wholly owned by parent, at
least one director on parent's board also served on subsidiary's
board, and because parent owned 100% of the stock of subsidiary,
the parent thereby controlled the subsidiary).

2.   Alter Ego

"The alter ego doctrine arises when a plaintiff comes
into court claiming that an opposing party is using the corporate
form unjustly and in derogation of the plaintiff's interests."
Mesler v. Bragg Mgmt. Co., 39 Cal. 3d 290, 300 (1985).  Under the
doctrine, "[a] corporate identity may be disregarded--the
'corporate veil' pierced--where an abuse of the corporate
privilege justifies holding the equitable ownership of a
corporation liable for the actions of the corporation."  Sonora
Diamond, 83 Cal. App. 4th at 538.  "[C]ourts will ignore the
corporate entity and deem the corporation's acts to be those of
the persons or organizations actually controlling the
corporation" "when the corporate form is used to perpetrate a
fraud, circumvent a statute, or accomplish some other wrongful or
inequitable purpose."  Id.

The doctrine may be invoked when two conditions are
met: (1) there is such a unity of interest and ownership that the
separate corporations are merged, so that one corporation is a
mere adjunct of another or the two companies form a single
enterprise; and (2) there will be an inequitable result if the

10

1    acts in question are treated as those of one corporation alone.

2    <u>Tran v. Farmers Grp., Inc.</u>, 104 Cal. App. 4th 1202, 1219 (1st

3    Dist. 2002); <u>Sonora Diamond</u>, 83 Cal. App. 4th at 538.  "To put it

4    in other terms, the plaintiff must show specific manipulative

5    conduct by the parent toward the subsidiary which relegate[s] the

6    latter to the status of merely an instrumentality, agency,

7    conduit or adjunct of the former[.]"  <u>Laird</u>, 68 Cal. App. 4th at

8    742 (first alteration in original) (internal quotation marks and

9    citations omitted).

10                   a.   <u>Unity of Interest</u>

11         For the unity of interest element, courts consider

12   several factors, including:

13        inadequate capitalization, commingling of funds and other
          assets of the two entities, the holding out by one entity
14        that it is liable for the debts of the other, identical
          equitable ownership in the two entities, use of the same
15        offices and employees, use of one as a mere conduit for
          the affairs of the other, disregard of corporate
16        formalities, lack of segregation of corporate records,
          and identical directors and officers.

17

18   <u>Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.</u>, 99 Cal. App. 4th

19   228, 245 (4th Dist. 2002)

20         Plaintiffs allege a number of facts that are sufficient

21   under California law to question the independence and

22   separateness of Atlantic Mutual and Centennial.  They allege that

23   Centennial and Atlantic Mutual share a bank account; that

24   Atlantic Mutual repeatedly represented itself as obligated to pay

25   for Centennial's obligations under plaintiffs' insurance policy;

26   that while Centennial issued plaintiffs' policy, Atlantic Mutual

27   completed the obligations under it; that Atlantic Mutual and

28   Centennial share common officers and directors; that Atlantic

                                  11

1  Mutual and Centennial used the same home office; and that

2  Atlantic Mutual and Centennial did not respect their purported

3  corporate separateness.  These factual allegations are more than

4  the mere "broad and insufficient" allegations of the factors that

5  courts have found fail to show a unity of interest.  <u>See, e.g.,</u>

6  <u>Mililani Grp., Inc. v. O'Reilly Auto., Inc.</u>, 2:12-CV-00891 JAM,

7  2012 WL 5932980, at *2 (E.D. Cal. Nov. 27, 2012) (Mendez, J.).

8          Defendants cite no case holding that comparable

9  allegations are insufficient to show a unity of identity.  <u>Cf.</u>

10  <u>Pac. Mar. Freight, Inc. v. Foster</u>, 10-CV-0578-BTM-BLM, 2010 WL

11  3339432, at *6 (S.D. Cal. Aug. 24, 2010) (noting that "[t]he

12  identification of the elements of alter-ego liability plus two or

13  three factors has been held sufficient to defeat a 12(b)(6)

14  motion to dismiss").  Cases found by the court support the

15  proposition that plaintiffs have alleged facts supporting

16  factors--commingling of funds, the holding out by one entity that

17  it is liable for the debts of the other, use of one entity as the

18  mere conduit of the other--that are particularly indicative of a

19  unity of interest and, where pled, sufficient to avoid dismissal

20  of a defendant who is alleged to be liable as an alter ego.  <u>See</u>

21  <u>id.</u> at *7 (unity of interest sufficiently alleged where plaintiff

22  pled commingling of funds and domination and control of sole

23  owner over entity); <u>Axon Solutions, Inc.</u>, 2010 WL 1797028, at *3

24  (unity of interest sufficiently alleged where plaintiff alleged

25  that city wholly owned company, city deliberately

26  undercapitalized company, city and company commingled funds, and

27  city represented that it was liable for company's debts).

28  Plaintiffs have therefore sufficiently pled the first prong for

alter ego liability.

                  b.   Inequitable Result

      To allege the inequitable result element of the alter ego theory, plaintiffs must allege bad-faith conduct by defendants. Mid-Century Ins. Co. v. Gardner, 9 Cal. App. 4th 1205, 1213 (3d Dist. 1992). "[T]he kind of inequitable result that makes alter ego liability appropriate is an abuse of the corporate form, such as under-capitalization or misrepresentation of the corporate form to creditors." Firstmark Capital Corp. v. Hempel Fin. Corp., 859 F.2d 92, 94 (9th Cir. 1988) (internal quotation marks and citations omitted) (applying California law). "[W]hile the doctrine does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished." Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 838 (1st Dist. 1962).

      Plaintiffs allege that "severe injustice would be imposed upon the plaintiffs by recognizing defendants as separate entities, in that defendants would be permitted to create an artifice to promote injustice to avoid bad faith liability to the plaintiffs, whereby Centennial issued the policy, but Atlantic Mutual, which committed and engaged in the many acts [in] bad faith, disclaims responsibility as a non-signatory to the policy." (FAC ¶ 13(d).) Plaintiffs thus allege that recognizing separateness between Atlantic Mutual and Centennial would allow Atlantic Mutual to use the corporate form to avoid liability for the harm it allegedly caused to plaintiffs by preventing fulfillment of the obligations due to them under their insurance policy. Plaintiffs' allegations are therefore sufficient to met

1  the inequitable result prong at the pleading stage.  See Axon,

2  2010 WL 1797028, at *3 (finding fact that alter ego could

3  dissolve wholly owned corporation to destroy any remedy available

4  to the plaintiff rose to the level of an inequitable act for

5  purposes of alter ego doctrine at the pleading stage).

6  Accordingly, plaintiffs' claims for breach of contract and breach

7  of the implied covenant of good faith and fair dealing against

8  Atlantic Mutual cannot be dismissed.

9       B.   Declaratory Relief

10          Defendants argue that plaintiffs' claim for declaratory

11  relief should be dismissed because plaintiffs no longer have any

12  basis to seek declaratory relief as to defendants' obligation to

13  pay defense costs and there is no action to which such a

14  prospective duty would apply.  (Mem. in Supp. at 13:20-28 (Docket

15  No. 219-1).)  Plaintiffs did not oppose this argument; they

16  failed to address it all.  Accordingly, plaintiffs' claim for

17  declaratory relief will be dismissed.  See Silva v. U.S. Bancorp,

18  5:10-CV-01854-JHN, 2011 WL 7096576, at *3 (C.D. Cal. Oct. 6,

19  2011) (finding that plaintiff conceded that claim should be

20  dismissed by failing to address defendants' arguments in his

21  opposition).

22          IT IS THEREFORE ORDERED that defendants' motion to

23  dismiss be, and the same hereby is, DENIED IN PART as to

24  plaintiffs' claims for breach of contract and breach of the

25  implied covenant of good faith and fair dealing against Atlantic

26  Mutual and GRANTED IN PART as to plaintiffs' claim for

27  declaratory relief.

28  ///

14

DATED:   July 19, 2013

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE