UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| DALE M. WALLIS, D.V.M., JAMES L. WALLIS, an HYGIEIA BIOLOGICAL LABORATORIES, INC., a California Corporation, | No. CIV. 08-02558 WBS AC |
| Plaintiffs, | MEMORANDUM OF DECISION |
| v. | |
| CENTENNIAL INSURANCE COMPANY, INC., a New York Corporation, ATLANTIC MUTUAL INSURANCE CO., INC., a New York Corporation, | |
| Defendants, | |
| AND RELATED COUNTERCLAIMS AND THIRD PARTY COMPLAINT. | |

----oo0oo----

        Plaintiffs Dale M. Wallis, D.V.M. ("Dr. Wallis"), James

L. Wallis ("Mr. Wallis"), and Hygieia Biological Laboratories,

Inc. ("Hygieia") filed this suit against defendants Centennial

Insurance Company, Inc. ("Centennial") and Atlantic Mutual

Insurance Company ("Atlantic Mutual") arising out of defendants'

alleged wrongdoing in defending Dr. Wallis under a professional

1

1   liability insurance policy.  Defendants subsequently filed a

2   counterclaim against plaintiffs and a third party complaint

3   ("TPC") against plaintiffs' attorney, Joanna Mendoza.

4         After conducting a nine-day bench trial, the court

5   finds in favor of defendants on both of plaintiffs' claims.  The

6   court further finds in favor of defendants on their counterclaims

7   against plaintiffs.  Finally, the court finds in favor of third

8   party defendant on defendants' third party complaint.  This

9   memorandum constitutes the court's findings of fact and

10  conclusions of law pursuant to Federal Rule of Civil Procedure

11  52(a).

12  I.   Factual and Procedural Background

13            A.   Factual Background

14        The underlying evidentiary facts are for the most part

15  undisputed.  Most of the relevant communications were in writing.

16  The letters and emails containing those communications are in

17  evidence, and the court incorporates them into this decision.

18  All objections as to relevance were reserved, and the court has

19  considered only those exhibits and that testimony which may

20  relate to the facts and issues discussed in this decision.

21        Dr. Wallis is a research veterinarian who has been

22  licensed to practice veterinary medicine in California since

23  1988.  Mr. Wallis is the former husband of Dr. Wallis and

24  president of Hygeia.

25        In 1988, Dr. Wallis purchased a professional liability

26  insurance policy ("the Policy") through the American Veterinary

27  Medical Association Professional Liability Insurance Trust.  Dr.

28  Wallis was issued the Policy from Centennial as a "member of the

2

1  Atlantic Mutual Companies."[1]  (Ex. 1.)

2         In 1994, Dr. Wallis filed suit in the Superior Court of

3  California, County of Yolo, against her former employer, Poultry

4  Health Laboratories ("PHL"), alleging causes of action for unjust

5  enrichment, fraud, conspiracy, constructive fraud, constructive

6  trust, and conversion.  In 1999, PHL filed a cross-complaint

7  against Dr. Wallis, Mr. Wallis, and Hygieia, alleging causes of

8  action for declaratory relief, rescission, intentional

9  interference with contractual advantage, fraud, misappropriation

10  of trade secrets, conversion, breach of fiduciary duty, unfair

11  competition, and conspiracy.

12         On May 26, 1999, Centennial agreed to provide a defense

13  of the PHL cross-complaint subject to a reservation of rights.

14  (Ex. 15.)  Because defendants provided the defense under a

15  reservation of rights, plaintiffs retained independent counsel of

16  their own choosing ("Cumis counsel") pursuant to California Civil

17  Code section 2860.  Plaintiffs selected third party defendant

18  Mendoza, then at Graham & James LLP, as Cumis counsel.  (Ex. 14.)

19  Mendoza had previously been representing plaintiffs in their

20  underlying suit against PHL.  (Id.)  Subsequently, Mendoza joined

21  the firm Livingston & Mattesich.  (Ex. 16.)

22         Plaintiffs successfully moved to bifurcate the trial on

23  the complaint and the cross-complaint.  In 2000, after trial on

24  the complaint, a jury awarded Dr. Wallis more than $2 million in

25  compensatory damages and $500,000.00 in punitive damages.  (Ex.

26  NNN.)  The trial court also awarded Dr. Wallis a constructive

27  ─────────────

28         [1]    For the purposes of this decision, the court makes no
distinction between Centennial and Atlantic Mutual.

1  trust against PHL for more than one million dollars.  (Id.)  The

2  court, however, did not enter final judgment because the cross-

3  complaint was still pending.  (Id.)

4         The first billing issues began in late 2002.  On

5  December 23, 2002, Mendoza sent an email to Tanya Turner, a claim

6  specialist at Atlantic Companies, informing Turner that the

7  insurance company was past due on about $90,000.00 in legal fees,

8  with $113,000.00 owed in total to Mendoza's firm.  (Ex. 26.)

9  Turner responded the next day that she would "handle the

10  invoices" but informed Mendoza that Mendoza had failed to provide

11  timely reporting on the case and that the "bills are consistently

12  high."  (Id.)  Mendoza testified that this was the first instance

13  she had heard of a requirement to send status reports to the

14  insurer, and she did not recall when she received payment on the

15  invoice.

16         In early 2003, the parties reached a tentative

17  agreement to settle both plaintiffs' complaint as well as PHL's

18  cross-complaint.  (Ex. 29.)  Defendants did not agree to the

19  settlement, contending that one of its provisions requiring

20  defendants to pay Dr. Wallis $1 million directly was not covered

21  under the Policy.  (Ex. 44.)

22         From July 2000 to November 2003, defendants paid a

23  total of $932,743.82 to Livingston & Mattesich.  (Ex 305.)  In

24  fall of 2003, Mendoza formed the firm Malovos & Mendoza LLP.

25  (Ex. 64.)  Mendoza's final invoice from Livingston & Mattesich

26  reflects an unpaid balance due of $336.50.  (Ex. 500.)

27         Mendoza testified that, through late 2003 and early

28  2004, Atlantic Mutual paid bills slowly, but that she received

1   responses on bill inquiries "fairly quickly."  For example, on

2   February 10, 2004, Mendoza sent Turner another status report and

3   again complained that it had been "about 60 days" since receiving

4   the last payment.  (Ex. 79.)  Then, on February 23, 2004, Mendoza

5   received a payment of $71,985.53 on her December and January

6   invoices, paying the balance due in full.  (Ex. 502 at 75.)  By

7   November 2004, after receiving a payment of $100,239.41,

8   Mendoza's invoice reflected a balance of $107,479.63.  (Ex. 502

9   at 181.)

10        In August 2005, Turner informed Mendoza that Mendoza's

11   bills would be subsequently subject to independent auditing.

12   (Ex. 105.)  In September, Atlantic Mutual issued a check for

13   $31,438.17 to Malovos & Mendoza for Mendoza's January-April

14   invoices.  (Ex. 117.)  This payment reflected deductions of

15   $79,027.00 in questioned fees and $1,471.84 in questioned

16   expenses by the independent audit.  (Ex 116.)  Mendoza objected

17   to the deductions, contending that she had never received any

18   billing guidelines from Atlantic Mutual.  (Ex. 118.)

19        On October 4, 2005, Mendoza informed Turner that she

20   would be raising her hourly rate from $200 an hour to $300 an

21   hour.  (Ex. 125.)  On October 28, 2005, Atlantic Mutual issued

22   Mendoza a check for $77,442.80 for Mendoza's fees from May 2005

23   to August 2005.  The fees had been audited and reduced from an

24   invoice billing $151,491.12.  (Ex. 127.)

25        The reductions and audits continued through 2006 and

26   2007, with defendants asserting limitations on the amount of time

27   spent on research, (Ex. 174), and objecting to the billing rates

28   of Joel Baiocchi, a solo practitioner who had worked with Mendoza

1  at Livingston & Mattesich and who was now assisting Mendoza on a

2  contract basis, (Ex. 176).

3       On October 19, 2007, defendants' coverage attorney Gary

4  Selvin sent Mendoza a letter seeking an accounting of Mendoza's

5  unpaid invoices in order to address the billing dispute.  (Ex.

6  237.)  In the letter, Selvin promised to reimburse Mendoza $1,000

7  for related clerical expenses and promised a $100,000 "good

8  faith" payment toward the outstanding fees owed.  (Id.)

9  Defendants sent the check to Malovos & Mendoza on October 22,

10  2007.  (Ex. 239.)  This was the last check defendants would send

11  Mendoza.  On October 27, 2007, Mendoza sent a short response

12  promising to get back to defendants.  (Ex. 240.)

13       On December 12, 2007, Selvin sent Mendoza another

14  letter reiterating defendants' request that Mendoza compile all

15  outstanding bills in order to "move forward on the billing

16  issues."  (Ex. 255.)  Mendoza testified that she never responded

17  to the letter.  By that time, defendants had paid Malovos &

18  Mendoza a total of $1,757,211.52 dating back to 2003.  At no

19  point did Mendoza seek payment directly from plaintiffs.

20       In 2007, Mennemeier, Glassman & Stroud associated in as

21  additional Cumis counsel to assist in the defense of the cross-

22  complaint.  (Ex. 181.)  Defendants ultimately paid the firm

23  $382,082.98.  (Ex. 305.)  Andy Stroud testified that the firm

24  signed an agreement with defendants and is not seeking any

25  further payments in the matter.

26       In January 2007, the discovery referee in the PHL

27  cross-action issued a report recommending sanctions under

28  California Code of Civil Procedure section 128.5 against Dr.

6

1   Wallis, Mr. Wallis, and Mendoza for the violation of a protective

2   order and obtaining information that was inadvertently not filed

3   under seal.  (Ex. 514.)  In April 2007, the trial court adopted

4   the referee's recommendations and awarded sanctions of $43,678.42

5   jointly and severally against Mendoza and plaintiffs.  (Id.)

6        Defendants agreed to fund the appeal of the sanctions

7   motion under a reservation of rights, but refused to fund

8   Mendoza's defense.  (Ex. 254.)  The Third District Court of

9   Appeal upheld the sanctions order, and the California Supreme

10  Court ultimately denied review.  Defendants paid Mennemeier,

11  Glassman & Stroud $115,995.90 to defend the sanctions motion on

12  appeal.  (Ex. 505.)  Dr. Wallis paid the sanctions award herself.

13       By the end of October 2008, at which time plaintiffs

14  filed the complaint in this action, Mendoza's invoices reflected

15  a balance due of $872,927.59, some of which comprised interest on

16  the difference between the previous payments defendants made and

17  the total Mendoza sought.  (Ex. 503 at 3.)

18       In May 2009, Mennemeier, Glassman & Stroud withdrew as

19  Cumis counsel for plaintiffs, citing a breakdown in the attorney-

20  client relationship, as well as "ongoing differences" with

21  Mendoza.  (Ex. OOO at 120.)  At trial, Stroud testified that the

22  reasons for withdrawal were not related to Centennial or Atlantic

23  Mutual.  That month, Mendoza also attempted to withdraw from the

24  case but the trial judge denied her motion.

25       Subsequently, plaintiffs engaged Sedgwick, Detert,

26  Moran & Arnold LLP to represent Dr. Wallis, (Ex. 349), and

27  Michael Wilcox of Bullivant Houser Bailey, PC, to represent Dr.

28  Wallis and Hygeia.  (Ex. 338.)  Wilcox, who had already been

7

1   involved in the matter representing Mr. Wallis on a limited

2   basis, (id.), testified that he did not understand his role to be

3   Cumis counsel, but acknowledged that the insurers did pay his

4   firm's bills.  At trial, both Steve Roland of Sedgwick and Wilcox

5   of Bullivant testified they were not seeking to collect any

6   unpaid fees from plaintiffs.  Sedgwick later withdrew because

7   Mendoza accused the firm of engaging in unethical conduct.  (Ex.

8   491.)

9        On July 20, 2009, the parties reached a mediated

10   settlement of the PHL cross-action.  (Ex. H.)  According to a

11   handwritten agreement, defendants agreed to pay PHL $2 million,

12   PHL agreed to pay plaintiffs $173,000 to compensate for a second

13   sanctions award Hygieia paid, and PHL agreed to dismiss the

14   cross-complaint against plaintiffs.  (Id.)  The agreement allowed

15   Dr. Wallis to continue pursuing her complaint against PHL.  (Id.)

16        PHL dismissed the cross-complaint on July 6, 2010.

17   Following the settlement of the cross-action, the trial court

18   entered judgment on the 2000 trial of plaintiffs' complaint

19   against PHL.  (Ex. NNN at 10).  The judgment against PHL included

20   $1,944,997 on the jury's fraud verdict, $500,000 on the jury's

21   punitive damages verdict, and $671,259 on the equitable claims.

22   (Id.)  However, in calculating prejudgment interest on the

23   claims, the trial judge offset the amount of compensatory damages

24   awarded to Dr. Wallis by the amount of the settlement on PHL's

25   cross-complaint.  (Id.)  The parties refer to this calculation as

26   "the offset."

27        On October 17, 2013, however, the Third District Court

28   of Appeal reversed the trial court's calculation of damages based

8

1   on the offset and held that the trial judge should have

2   calculated pre-judgment interest solely off Dr. Wallis's

3   judgment.  (Id.)

4           B.   Procedural Background

5           Plaintiffs filed this action on October 27, 2008,

6   bringing claims for breach of the duty to defend and breach of

7   the implied covenant of good faith and fair dealing, (Docket No.

8   1), as well as a claim for breach of fiduciary duty that the

9   court later dismissed on defendants' motion for judgment on the

10  pleadings.  (Docket No. 17.)  On December 23, 2008, defendants

11  filed counterclaims against plaintiffs for declaratory relief

12  regarding the reasonableness of Cumis counsel's fees and the duty

13  to indemnify or defend plaintiffs for breach of the protective

14  order.  (Docket No. 9.)  Defendants also filed the TPC against

15  Mendoza alleging a single claim for declaratory relief and

16  reimbursement of any and all sums paid for the purpose of

17  defending Mendoza against the motion for sanctions.  (Id.)

18          On April 16, 2009, the court granted defendants' motion

19  to compel arbitration under California Civil Code section 2860(c)

20  "with respect to the amount of attorney's fees allegedly owed to

21  Cumis counsel."  (Docket No. 41.)  The court retained

22  jurisdiction "over issues not squarely involving the calculation

23  of Cumis counsel fees."  (Id.)  On June 25, 2010, the court

24  reaffirmed this Order on plaintiffs' motion for reconsideration,

25  holding that the "mere fact that plaintiffs' Complaint includes

26  causes of action for bad faith and breach of contract does not

27  exempt the Cumis fee dispute from section 2860 arbitration."

28  (Docket No. 121.)

                                9

1    In July 20, 2009, the PHL cross-action settled, but
2 the settlement agreement also included terms purporting to settle
3 the present action, with the exception of claims subject to the
4 court's April 16, 2009, order to compel arbitration.  (Ex. H.)
5 The agreement contained the provision that "this release will be
6 reduced to a formal release to be executed by all parties."
7 (Id.)  The document went on to state, however, that "this
8 agreement is binding upon all signators, whether or not the
9 parties execute a formal agreement."  (Id.)

10    On January 20, 2010, the court denied plaintiffs'
11 motion to enforce the July 20, 2009, agreement.  (Docket No. 74.)
12 On June 25, 2010, the court denied defendants' motion to enforce
13 the agreement, finding that, because it was uncertain whether the
14 July 2009 document was intended to be a completed agreement and
15 the parties proceeded to dispute the terms of the agreement, it
16 appeared "that the parties never had a meeting of the minds."
17 (Docket No. 120.)

18    In September 2010, Centennial and Atlantic Mutual were
19 declared insolvent and placed into Rehabilitation Status by the
20 Superintendent of Insurance of the State of New York.  (Docket
21 No. 122.)  On December 7, 2010, the court ordered the action
22 stayed.  (Docket No. 124.)  The court lifted the stay on May 1,
23 2012.  (Docket No. 141.)

24    On February 27, 2013, the court granted Atlantic
25 Mutual's motion for judgment on the pleadings, holding that
26 plaintiffs had not sufficiently alleged that Atlantic Mutual was
27 a party to the insurance policy.  (Docket No. 212.)  Plaintiffs
28 filed an amended complaint on March 20, 2013, (Docket No. 214),

1  which the court ordered stricken after plaintiffs included new

2  claims.  (Docket No. 216.)  Plaintiffs filed their current

3  operative complaint on April 4, 2013, bringing claims for

4  declaratory relief, breach of insurance contract, and breach of

5  the implied covenant of good faith and fair dealing.  (Docket No.

6  217).  On July 19, 2013, the court granted defendants' motion to

7  dismiss the declaratory relief claim.  (Docket No. 228.)

8  II.  Discussion

9       A.   Plaintiffs' Breach of Contract Claim

10           Plaintiffs first bring a claim for breach of contract,

11  contending that defendants' delay and reduction of payments to

12  plaintiffs' counsel constituted a breach of defendants' duty to

13  defend under the Policy.  As set forth below, the court finds

14  that Centennial and Atlantic did not breach their duty to defend.

15  Further, even if defendants breached their duty, the court finds

16  that plaintiffs did not suffer any damages as a result.

17           1.   Defendants Did Not Breach Their Duty to Defend

18           Under the Policy, defendants had a duty to defend

19  against covered third party claims by mounting and funding a

20  defense.  Gray Cary Ware & Freidenrich v. Vigilant Ins. Co., 114

21  Cal. App. 4th 1185, 1189 (4th Dist. 2004).  This duty included

22  "providing competent counsel and paying all reasonable and

23  necessary costs."  Id.  (citing Aerojet-Gen. Corp. v. Transp.

24  Indem. Co., 17 Cal. 4th 38, 57-58 (1997)).

25           "Where, as here, an insurer provides a defense under a

26  reservation of rights, a conflict of interest may arise between

27  the insurer and its insured, providing the insured with the right

28  to demand independent counsel," also known as Cumis counsel.  Id.

11

1    at 1190 (citing <u>San Diego Navy Fed. Credit Union v. Cumis Ins.</u>

2    <u>Soc'y, Inc.</u>, 162 Cal. App. 3d 358, 364 (4th Dist. 1984)).  By

3    statute, the insurer must pay <u>Cumis</u> counsel only those fees

4    equivalent "to the rates which are actually paid by the insurer

5    to attorneys retained by it in the ordinary course of business in

6    the defense of similar actions in the community where the claim

7    arose or is being defended."   Cal. Civ. Code § 2860(c).  Unless

8    otherwise provided for in an agreement between the parties,

9    "[a]ny dispute concerning attorney's fees . . . shall be resolved

10   by final and binding arbitration by a single neutral arbitrator

11   selected by the parties to the dispute."   <u>Id.</u>

12        In some circumstances amounting to a breach of the duty

13   to defend, however, an insurer may forfeit its right to arbitrate

14   under section 2860.[2]  In one case, the failure to pay at all in

15   two actions, and payment of $130,579.40 out of $2,253,433.48

16   billed in another, constituted a breach of the insurers' duty to

17   defend sufficient to extinguish their right to compel arbitration

18   under section 2860.  <u>Seagate Tech. LLC v. Nat'l Union Fire Ins.</u>

19   <u>Co. of Pittsburg, Pa.</u>, 737 F. Supp. 2d 1013, 1017 (N.D. Cal.

20   2010).  In another, an insurer's improper refusal to accept

21   tender of the insured's defense precluded arbitration under

22   _____

          [2]   "California Courts of Appeals [sic] have been somewhat
23   inconsistent in their treatment of the timing of arbitration
     within larger coverage actions over the duty to defend."
24   <u>Arrowood Indem. Co. v. Bel Air Mart</u>, No. 2:11-CV-00976-JAM, 2013
     WL 2434830, at *5 (E.D. Cal. June 4, 2013).  What is clear,
25   however, is that the trial court must initially resolve the
     question of whether the insurer <u>owes</u> a duty to defend before
26   submitting any fee dispute to arbitration.  <u>See, e.g.</u>, <u>Handy v.</u>
     <u>First Interstate Bank</u>, 13 Cal. App. 4th 917, 927 (2d Dist. 1993).
27   Such circumstances are not present here, as defendants do not
     dispute they owed a duty to defend.
28

                                  12

1   section 2860.  *Concept Enters., Inc. v. Hartford Ins. Co. of the*

2   *Midwest*, No. CV007267NM(JWJX), 2001 WL 34050685, at *4 (C.D. Cal.

3   May 22, 2001); *see also Atmel Corp. v. St. Paul Fire & Marine*,

4   426 F. Supp. 2d 1039, 1047 (N.D. Cal. 2005) ("Here, it is

5   undisputed that St. Paul did not defend Atmel in the *Seagate*

6   Action, and thus the Court concludes defendant cannot avail

7   itself of the protections and limitations set forth in § 2860.");

8   *Janopaul + Block Cos. v. Superior Court*, 200 Cal. App. 4th 1239,

9   1248 (4th Dist. 2011) (holding that insurer who "waited more than

10  two years to accept the tender of defense and nearly three years

11  to begin paying for that defense" could not arbitrate amount of

12  fees owed before court determined issues of bad faith and breach

13  of the duty to defend).[3]

14        The present case is distinguishable.  Here, defendants

15  acknowledged their duty to defend the plaintiffs against the PHL

16  cross-complaint and agreed to provide independent *Cumis* counsel

17  pursuant to section 2860.  Thus the principles embodied in

18  *Concept Enterprises*, 2001 WL 34050685, at *4, and *Atmel*, 426 F.

19  Supp. 2d at 1047, wherein the insurer could not seek arbitration

20  after making an improper refusal to defend, do not apply.

21        Although defendants did not pay Mendoza's

22  bills in full, they were required only to pay fees that were

23  _____

24        [3]   Plaintiffs also rely on a recent California Court of
    Appeal case holding that an insurer who initially refused to
25  accept tender of the defense in a matter for which it had a duty
    to defend could not compel arbitration.  *J.R. Mktg., L.L.C. v.*
26  *Hartford Cas. Ins. Co.*, 216 Cal. App. 4th 1444 (1st Dist. 2013),
    review granted and opinion superseded sub nom. *Hartford Cas. Ins.*
27  *v. J.R. Mktg.*, 162 Cal. Reptr. 3d 1 (2013).  Because the
    California Supreme Court has granted review of the case, it is
28  now considered unpublished.  Cal. R. Ct. 8.1105.

1  "reasonable and necessary" and therefore withholding any portion

2  of fees cannot constitute a breach per se.  See NextG Networks,

3  Inc. v. OneBeacon Am. Ins. Co., No. 11-CV-05318-RMW, 2012 WL

4  3017689, at *5 (N.D. Cal. July 23, 2012) ("Aerojet does not

5  impose on an insurer a prophylactic duty to assume expenses

6  alleged by its insured to be 'reasonable and necessary' to

7  minimize liability in a covered action.").  Plaintiffs have

8  failed to offer any evidence establishing that the withheld fees

9  were "reasonable and necessary" to their defense.

10          Moreover, the deductions to payments made by defendants

11  here did not rise to the levels in Seagate, where the insurers

12  paid only $130,579.40 out of $2,253,433.48 billed, a percentage

13  below six percent.  737 F. Supp. 2d at 1015.  In contrast,

14  defendants had paid Mendoza's firms $2,716,147.36 in attorneys'

15  fees through October 2007, (Ex. 305), after which time defendants

16  made no further payments to Mendoza but continued paying other

17  Cumis counsel.  By the time plaintiffs filed the complaint in

18  this case, Mendoza claimed a balance due of $872,927.59.  (Ex.

19  503 at 3.)  Mendoza's final invoice showing any activity relating

20  to the cross-complaint, dated October 1, 2010, reflects a balance

21  of $1,288,039.46 owed, some of which comprised of interest on the

22  difference between the previous payments defendants made and the

23  total Mendoza sought.  (Id. at 50.)  Because Mendoza still

24  received a substantial amount of funding, the court finds the

25  deficiencies in payments did not rise to the level of a breach of

26  defendants' duty under the insurance contract, and defendants did

27  not forfeit their right to arbitrate the fee dispute.

28          Thus, plaintiffs' claims seeking reimbursement of

1  unpaid fees and costs to Mendoza and Baiocchi, most of whose fees

2  are billed on Mendoza's invoices, are subject to section 2860

3  arbitration.  Without a determination from the arbitrator that

4  the full amount of fees sought by Mendoza and Baiocchi were

5  "reasonable and necessary," defendants' withholding of the full

6  amount of fees cannot serve as a basis for plaintiffs' breach of

7  contract and bad faith claims here.  Cf. Behnke v. State Farm

8  Gen. Ins. Co., 196 Cal. App. 4th 1443, 1468 (4th Dist. 2011)

9  (holding that breach of contract claim for unpaid fees depended

10  on arbitrator's determination of what fees were reasonable, and

11  awarding summary judgment to insurer on claim after insurer paid

12  amount owed under arbitration award).

13          Accordingly, because plaintiffs have not proved that

14  defendants withheld reasonable or necessary fees to the defense,

15  the court finds that defendants did not breach their duty to

16  defend.[4]

17              2.   Plaintiffs Did Not Suffer Damages from Any Breach

18  _____

19  [4]      Plaintiffs also contend that defendants breached the
    duty to defend by imposing billing guidelines on Cumis counsel,

20  citing dicta from one California Court of Appeal decision
    hypothesizing that "[i]nsurer-imposed restrictions on discovery

21  or other litigation costs may well violate the insurer's duty to
    defend."  Dynamic Concepts, Inc. v. Truck Ins. Exch., 61 Cal.

22  App. 4th 999, 1009 (4th Dist. 1998).  The court is not aware of
    any published case applying this dicta and will not do so here.

23  Even though such limitations "may well" breach the duty to defend
    in some instances, plaintiffs have not shown the billing

24  guidelines imposed by defendants were unreasonable or
    unnecessary.  In any event, the imposition of billing guidelines

25  is not actionable here since there is no evidence that
    plaintiffs' attorneys were precluded from engaging in any

26  specific discovery, hiring of expert witnesses, conducting
    research, or pursuing any other litigation tactic.  Nor have

27  plaintiffs demonstrated they suffered any damages as a result of
    the billing guidelines.

28

1        Even if defendants breached their duty to defend,

2  plaintiffs have not shown by a preponderance of the evidence that

3  they suffered any damages as a result.  "A breach of contract is

4  not actionable without damage."  Bramalea Cal., Inc. v. Reliable

5  Interiors, Inc., 119 Cal. App. 4th 468, 473, (4th Dist. 2004).

6  "The general measure of damages for a breach of the duty to

7  defend an insured . . . are the costs and attorney fees expended

8  by the insured defending the underlying action."  Emerald Bay

9  Cmty. Ass'n v. Golden Eagle Ins. Corp., 130 Cal. App. 4th 1078,

10  1088-89 (4th Dist. 2005); see also Amato v. Mercury Casualty Co.,

11  53 Cal. App. 4th 825, 831 (2d Dist. 1997) ("Where an insured

12  mounts a defense at the insured's own expense following the

13  insurer's refusal to defend, the usual contract damages are the

14  costs of the defense.").  "A plaintiff may not recover damages

15  for an unpaid liability to a third party, unless the plaintiff

16  proves to a reasonable certainty that the liability could and

17  would be enforced by the third party against the plaintiff or

18  that the plaintiff otherwise could and would satisfy the

19  obligation."  Green Wood Indus. Co. v. Forceman Intern. Dev.

20  Grp., Inc., 156 Cal. App. 4th 766, 776 (2d Dist. 2007).

21        Here, plaintiffs have not persuaded the court that any

22  of them suffered damages from any act or omission of defendants.

23  Specifically, plaintiffs have not shown by a preponderance of the

24  evidence that they ever had, or will have, to make up the

25  shortfall between the fees Mendoza billed and the amount

26  defendants paid, much less that plaintiffs suffered any financial

27  impact defending against the cross-complaint.  See Amato, 53 Cal.

28  App. 4th at 831.  And whatever amount may be due to Mendoza

1  beyond the sums already paid will be adjudicated in the

2  arbitration.  Simply because plaintiffs say they owe Mendoza the

3  full amount she billed does not make defendants liable beyond

4  what the arbitrator determines to be reasonable and necessary.

5  See Behnke, 196 Cal. App. 4th at 1468-69 (holding that insurer

6  was not liable to insured, even though insured had granted

7  security interest in insured's residence to Cumis counsel to

8  cover unpaid fees, when insurer paid amount arbitrator deemed

9  reasonable).

10        In addition, each attorney who also worked on the case

11  alongside Mendoza testified that he had received payment from

12  defendants, and each stated that there no was no intention to

13  seek further payment from plaintiffs.  For example, Wilcox

14  testified that he believed all of his firm's bills were paid by

15  the insurers.  Roland testified that his firm was no longer

16  looking for any payment, and was not owed any fees by plaintiffs.

17  And Stroud testified that plaintiffs did not owe his firm any

18  outstanding fees.  Thus, even if defendants' delay and reduction

19  in payments to plaintiffs' attorneys amounted to a breach of the

20  duty to defend, the court finds that plaintiffs did not suffer

21  any damages therefrom because none of the attorneys sought or

22  seek payment from plaintiffs.  Any breach, therefore, is not

23  actionable.  See Emerald Bay, 130 Cal. App. 4th at 1088-89

24  (finding plaintiff insured could not show it suffered any

25  contract damages when insurer and third party paid its legal

26  expenses).[5]

27  _____

       [5]   Moreover, even if plaintiffs are correct that

28  defendants breached their duty to defend and therefore lost the
   right to arbitrate under section 2860, plaintiffs are incorrect

1     Plaintiffs demonstrate only one potential instance of

2     pecuniary loss relating to owed attorneys' fees or costs.  At

3     trial, Mr. Wallis testified that he personally paid Baiocchi in

4     relation to the settlement with the estate of a PHL principal

5     that was not party to the 2009 settlement.  Mr. Wallis provided

6     no documentation to substantiate this payment, nor did he testify

7     that he ever sought reimbursement from defendants for this

8     payment.  Without such documentation, the court cannot determine

9     whether these payments related to work done on the complaint, for

10    which the defendants owed no coverage, or the cross-complaint.

11    At the time, Mennemeier, Glassman & Stroud, as well as Mendoza,

12    were representing plaintiffs on the cross-complaint, while

13    Baiocchi was counsel of record on the underlying complaint, which

14    was not subject to the insurers' duty to defend.  Later, after

15    Mennemeier, Glassman & Stroud withdrew, Wilcox was attorney of

16

17    that they would be entitled to all fees Mendoza billed regardless
      of whether those fees where reasonable and necessary to
18    plaintiffs' defense.  See NextG Networks, Inc., 2012 WL 3017689,
      at *5 ("[W]here the insurer refuses to defend, the insured may
19    recover both any excess judgment and the 'expenses of
      litigation.'  But an insured's expenditures cannot be recoverable
20    simply because the insured elected to incur them; otherwise, an
      insurer could be held liable for expenses that far exceed those
21    necessary to defend an action covered by the policy.  Thus,
      Aerojet and its progeny establish an objective standard,
22    requiring the court to consider 'whether the benefits of the
      [insured's] strategy are worth the cost.'  Put another way,
23    Aerojet stands for the proposition that where an insurer refuses
      to defend, it is liable for any costs it would reasonably have
24    incurred had it complied with its contractual obligation in the
      first place.") (internal citations omitted) (second alteration in
25    original).  Here, plaintiffs have not provided any persuasive
      evidence, in the form of expert testimony or even their own
26    testimony, that the withheld fees were reasonable and necessary
      to the defense of the cross-complaint.  Therefore, even assuming
27    plaintiffs are entitled to damages based on defendants'
      withholding of fees, they have failed to carry their burden in
28    establishing the amount of those damages.

1   record for Mr. Wallis on the cross-complaint while Sedgwick

2   Detert, Moran & Arnold represented Dr. Wallis.[6]  Accordingly,

3   plaintiffs have not shown by a preponderance of the evidence that

4   any payments made by Mr. Wallis to Baiocchi constituted damages

5   from defendants' failure to defend against the cross-complaint.

6          Because any fees owed to Mendoza and Baiocchi are

7   subject to arbitration under section 2680, Mendoza did not seek

8   any payment from plaintiffs, and the other attorneys who

9   represented plaintiffs have not sought and do not intend to seek

10  unpaid fees from plaintiffs, plaintiffs have not shown by a

11  preponderance of the evidence much less "to a reasonable

12  certainty" that any third party liability could and would be

13  enforced against them.  Green Wood, 156 Cal. App. 4th at 776.

14  Accordingly, because plaintiffs have not satisfied the court that

15  they incurred any damages, much less that defendants breached the

16  duty to defend in the first place, the court will enter judgment

17  in favor of defendants on the breach of contract claim.

18        B.   Plaintiffs' Bad Faith Claim

19          Plaintiffs' second claim is for breach of the implied

20  covenant of good faith and fair dealing.  For the reasons

21  discussed below, the court does not find that defendants engaged

22  in bad faith by unreasonably withholding any benefits under the

23  _____

24          [6]   Sedgwick's 2009 "to-do list," which received
    defendants' approval, includes an entry for "Hanzo settlement."
25  (Ex. 364.)  Thus, while the evidence may support an inference
    that this settlement was related to defense of the cross-
26  complaint, it also supports an inference that defendants were
    already paying existing Cumis counsel to handle the settlement.
27  Whether Mr. Wallis's payments to Baiocchi were reasonable and
    necessary to the defense, therefore, may be addressed in the
28  section 2860 arbitration.

                                19

1 Policy.  Further, even if plaintiffs could show bad faith,

2 plaintiffs have failed to show that they suffered any actionable

3 damages as a result.

1.   Plaintiffs Have Not Shown that Defendants Dealt in
     Bad Faith

6 "In order to establish a breach of the implied covenant

7 of good faith and fair dealing under California law, a plaintiff

8 must show: (1) benefits due under the policy were withheld; and

9 (2) the reason for withholding benefits was unreasonable or

10 without proper cause."  Guebara v. Allstate Ins. Co., 237 F.3d

11 987, 992 (9th Cir. 2001) (citing Love v. Fire Ins. Exch., 221

12 Cal. App. 3d 1136, 1151 (4th Dist. 1990)); see also Dynamic

13 Concepts, Inc. v. Truck Ins. Exch., 61 Cal. App. 4th 999, 1010

14 (4th Dist. 1998) ("A carrier is subject to tort liability for bad

15 faith only where it unreasonably fails to provide benefits due

16 under the policy or the law.").

17 The covenant of good faith and fair dealing "is implied

18 as a supplement to the express contractual covenants."  Waller v.

19 Truck Ins. Exch., Inc., 11 Cal. 4th 1, 36 (1995).  "Absent that

20 contractual right, however, the implied covenant has nothing upon

21 which to act as a supplement, and should not be endowed with an

22 existence independent of its contractual underpinnings."  Id.

23 (internal quotation marks omitted).

24 Initially, because plaintiffs have not proved a breach

25 of contract for the reasons discussed above, they have not shown

26 that any benefits due under the policy were withheld.  Even if

27 plaintiffs could prove they were denied benefits under the

28 policy, the court finds plaintiffs have failed to prove by a

1   preponderance of the evidence that "the reason for withholding

2   benefits was unreasonable or without proper cause." Guebara, 237

3   F.3d at 992.

4          The benefits which plaintiffs argue were withheld were

5   the fees allegedly due to plaintiffs' Cumis counsel.  Plaintiffs

6   have not proved, however, that the failure to pay the full amount

7   of fees charged by Mendoza and Baiocchi was unreasonable.  For

8   the reasons discussed above, whether the fees and costs charged

9   by Mendoza and Baiocchi were reasonable and necessary to the

10  defense is a question to be determined by the section 2860

11  arbitration, not by this court.  If the arbitrator determines

12  that defendants owe an amount less than the amount billed by

13  Mendoza and Baiocchi, defendants' decision to dispute the

14  billings would not have been unreasonable.  See Behnke, 196 Cal.

15  App. 4th at 1470 (holding that insurer's conduct in disputing

16  billed amount of fees and costs by plaintiff's attorney was

17  reasonable and not bad faith because arbitrator awarded amount

18  less than the amount originally billed).  The arbitration has not

19  yet occurred, and any determination made by this court as to its

20  result would be improperly speculative.  As with plaintiffs'

21  breach of contract claim, plaintiffs have not provided any

22  testimony--expert or otherwise--or other evidence that the full

23  amount of fees charged was reasonable or that the failure to pay

24  in full was unreasonable.  Accordingly, the refusal by defendants

25  to pay the full amount of fees charged by Mendoza and Baiocchi

26  cannot serve as a basis for plaintiffs' claim of bad faith.

27          Plaintiffs also argue that defendants acted

28  unreasonably by forcing plaintiffs to accept a settlement of the

1   PHL cross-complaint despite Dr. Wallis's preference to "seek

2   vindication" and continue litigation.  As a threshold matter, it

3   is not clear whether this issue is even properly before the

4   court.  Plaintiffs added the allegations regarding the settlement

5   in an amended complaint filed March 20, 2013.  (Docket No. 214.)

6   The court had previously given plaintiffs leave to amend after

7   granting Atlantic Mutual's motion for judgment on the pleadings,

8   holding that plaintiffs had not sufficiently alleged that

9   Atlantic Mutual was a party to the insurance policy.  (Docket No.

10  212.)  However, after plaintiffs' amended complaint included the

11  new allegations regarding the settlement, the court ordered the

12  amended complaint stricken.  (Docket No. 216.)  Plaintiffs'

13  current operative complaint, (Docket No. 217), does not contain

14  these allegations.  Defendants objected to the inclusion of the

15  claims in defendants' trial brief, (Docket No. 246), and the

16  court has ruled that neither side may amend their pleadings to

17  conform to proof because doing so would prejudice the other side.

18  See Fed. R. Civ P. 15(b)(1) ("The court should freely permit an

19  amendment when doing so will aid in presenting the merits and the

20  objecting party fails to satisfy the court that the evidence

21  would prejudice that party's action or defense on the merits.");

22  see also Davis & Cox v. Summa Corp., 751 F.2d 1507, 1522 (9th

23  Cir. 1985) ("The question whether the parties have impliedly

24  consented to the trial of an issue lies within the discretion of

25  the trial court."), superseded by statute on other grounds as

26  stated in Northrop Corp. v. Triad Int'l Mktg. S.A., 842 F.2d 1154

27  (9th Cir. 1988) (per curiam).

28          More importantly, assuming the issue is properly before

                                   22

the court, plaintiffs have failed to prove by a preponderance of
the evidence that defendants acted unreasonably with regard to
the settlement negotiations.  Multiple attorneys testified that,
because plaintiffs faced a potential adverse judgment of $15-20
million, settlement was a superior option to further litigating
the cross-complaint.  Stroud testified that he considered the
case to be a good one for settlement based on the significant
downside risk facing plaintiffs.  Roland corroborated the
assessment that plaintiffs faced a potential adverse judgment of
$15-20 million.  The court finds the testimony of these witnesses
credible and persuasive in their determination that settlement
was in the best interests of Dr. and Mr. Wallis.  And even Dr.
Wallis testified at trial that she made her own educated decision
to settle the cross-complaint, in an effort to protect herself
against the prospect of significant liability.  If the court
learned anything from the demeanor of Dr. Wallis while testifying
in this case it is that she is a strong willed individual who
makes up her own mind on decisions that may affect her interests.
The court cannot believe that she could be coerced into any
decision.

Plaintiffs further argue that defendants committed bad
faith at the mediation by lying about the impending insolvency of
Centennial and Atlantic Mutual in order to induce settlement.
Absent proof that defendants knowingly misrepresented their
financial status, however, the fact that Centennial and Atlantic
Mutual lasted longer than defendants predicted does not point to
any bad faith, nor does it change the remote possibility that the
insurers would have survived the duration of an entire trial and

1    appeal of the cross-complaint.  Given the undisputed fact that

2    the insurers faced, at the very least, an uncertain financial

3    future, the decision to settle was entirely reasonable.[7]

4    Accordingly, even if settlement was a result of some subtle

5    pressure by defendants, the court does not find that any actions

6    taken by defendants with respect to the settlement negotiations

7    were "unreasonable or without proper cause."  Guebara, 237 F.3d

8    at 992.

9           Finally, plaintiffs have not proved that defendants

10   unreasonably interfered with the ability of counsel to litigate

11   the case.  Instead, the record shows that Mendoza and plaintiffs

12   themselves caused much of the difficulties that ultimately

13   resulted in the withdrawal of counsel.  For example, Stroud

14   testified, and the record shows, that Mennemeier, Glassman &

15   Stroud sought to withdraw from its representation because of a

16   breakdown in the attorney-client relationship, as well as

17   "ongoing differences" with Mendoza.  (Ex. OOO at 120.)  Further,

18   Stroud specifically testified that the reasons for withdrawal

19   were not related to Centennial or Atlantic Mutual.  In addition,

20   Roland testified, and the record reflects, that Sedgwick Detert,

21   Moran & Arnold withdrew because Mendoza accused the firm of

22   engaging in unethical conduct.  (Ex. 491.)  Perhaps plaintiffs'

23   best evidence of any interference are disparaging comments

24   regarding plaintiffs made by Selvin to attorneys from PHL.  (Ex.

25   474.)  While these remarks are not of the kind that should be

26   _____

27           [7]    Any representations by defendants during mediation
     regarding their impending insolvency may simply have been efforts
     to put pressure on PHL--not plaintiffs--to settle the cross-
28   complaint.

1  condoned, they occurred after the cross-complaint settled and are

2  insufficient to support a finding of bad faith on their own.

3       Thus, because the record shows neither that any

4  reductions in payments affected plaintiffs' representation nor

5  that defendants otherwise interfered with the defense, plaintiffs

6  have not proven that they were unreasonably deprived of a policy

7  benefit of full representation in defense of the cross-

8  complaint.[8]

9       2.   <u>Plaintiffs Did Not Suffer Damages as a Result of</u>

10           <u>Any Act or Omission of Defendants</u>

11       Even if plaintiffs had sufficiently demonstrated an

12 unreasonable denial of benefits under the Policy, plaintiffs have

13 completely failed to prove any damages as a result of defendants'

14 alleged bad faith.

15       On the outset, plaintiffs' could not recover unpaid

16 attorneys' fees as damages for their claim of bad faith for the

17 same reasons stated with regard to their breach of contract

18 claim.  As with the breach of contract claim, the amount of

19 attorneys' fees owed to Mendoza and Baiocchi is subject to

20

21       [8]   Plaintiffs' contentions that defendants otherwise
   interfered with the ability of counsel to litigate the case are
22 without merit and unsupported by the evidence.  For example,
   plaintiffs claim that defendants prevented Mennemeier, Glassman &
23 Stroud from fully litigating the defense, resulting in an
   extensive "to-do list" by the time that Sedgwick Detert, Moran &
24 Arnold assumed the defense in 2009.  (Ex. 364.)  The court does
   not find such accusations credible, given that Roland testified
25 that defendants approved all items on Sedgwick's list, save for
   the funding of a mock trial.  Plaintiffs' protestations that
26 Mennemeier, Glassman & Stroud failed to advance the litigation
   especially ring hollow given the time and effort the firm had to
27 expend opposing the bad faith sanctions levied against plaintiffs
   and Mendoza for their behavior during the litigation.

28

arbitration, and plaintiffs' other counsel do not claim that plaintiffs owe them anything.

Aside from fees, plaintiffs argue that defendants' alleged bad faith resulted in (1) the failure to complete the purported settlement in 2003; (2) the inability of their attorneys to complete all of the tasks necessary to marshal their defense; and (3) a weakened position at the 2009 mediation.  Even if all that were so, it resulted in no economic loss to plaintiffs because it was defendants, not plaintiffs, who ultimately paid the full amount of the 2009 settlement, and any remaining damages would be the attorneys' fees incurred after 2003, which, for the reasons stated above, are not actionable.

Despite plaintiffs' contentions that they would have prevailed if Mendoza had fully litigated the cross-complaint to a verdict, the court finds that such an outcome is implausible. More importantly, even if plaintiffs had prevailed on the cross-complaint at trial, the best result they could have achieved would be a verdict that required them to pay nothing on the cross-complaint.  Because defendants bore the full cost of the settlement, the net economic result to plaintiffs was the same as if they had prevailed at trial – they paid nothing.  Plaintiffs have not demonstrated by a preponderance of the evidence that, but for defendants' conduct, it was more likely than not that plaintiffs would have received a superior outcome from the settlement, in which defendants paid PHL $2 million and PHL agreed to dismiss the cross-complaint against plaintiffs. Plaintiffs, therefore, have not proven any economic damages from the alleged bad faith of defendants in litigating, and ultimately

1   settling, the cross-complaint.

2          Plaintiffs argue that they suffered damages as a result

3   of the 2009 settlement because the state trial court applied the

4   "offset" to reduce the amount of prejudgment interest owed to

5   plaintiffs on their 2000 jury verdict.  Plaintiffs' argument

6   essentially boils down to the theory that, had Mendoza received

7   full funding from the insurers, she would have maintained the

8   lead in litigating the defense of the cross-complaint and would

9   have heeded Dr. Wallis's wishes not to settle, resulting in a

10  successful defense verdict on the cross-complaint and no offset.

11  However, this theory is counterfactual, entirely speculative, and

12  insufficient to carry plaintiffs' burden of proof.

13         First, there is no indication that full funding from

14  the insurers would have resulted in any different result in the

15  case.  Multiple attorneys who worked on defense of the cross-

16  complaint testified at trial that the reduced payments from the

17  insurers did not impact their defense of the case.  Stroud

18  testified that while the payment issues impacted who could staff

19  the case at Mennemeier, Glassman & Stroud, the firm did not make

20  any different strategic choices based on the payments.  Stroud

21  also testified that the payment issues did not affect the firm's

22  representation on the case, and that he did not recall plaintiffs

23  ever stating a concern with his firm adequately representing

24  them.  Wilcox affirmed this, testifying that while Stroud had

25  expressed some concerns with billing reductions, Stroud never

26  indicated that the issue was impacting Stroud's representation of

27  plaintiffs.

28         Second, as to the consequence of the offset, any

1 potential damages to plaintiffs as a result of the offset are now

2 entirely speculative given that the California Court of Appeal

3 overruled the trial court's application of the offset, rendering

4 any damages from the offset moot.  (See Ex. NNN.)  "[I]t is

5 fundamental that 'damages which are speculative, remote,

6 imaginary, contingent, or merely possible cannot serve as a legal

7 basis for recovery."  Piscitelli v. Friedenberg, 87 Cal. App. 4th

8 953, 989 (4th Dist. 2001) (citing Frustuck v. City of Fairfax,

9 212 Cal. App. 2d 345, 367-68 (1963)).  Although the offset could

10 be re-instated by the Court of Appeal on rehearing or by the

11 California Supreme Court on review, plaintiffs have failed to

12 convince the court that it is more likely than not that such an

13 outcome would occur.  To the contrary, having read the opinion,

14 this court concludes it is highly unlikely that it will be

15 overturned.  The court agrees with Stroud's testimony that it is

16 rare for the California Supreme Court to overrule an appellate

17 decision, and the court finds such an outcome especially unlikely

18 with an opinion as well-reasoned as this one.  Accordingly, any

19 damages to plaintiffs from the offset are speculative, uncertain,

20 and insufficient to merit a finding of bad faith.

21          Plaintiffs also argue that bad faith on the part of

22 defendants caused damages from the failed defense of the

23 sanctions motion.  However, as discussed above, Mennemeier,

24 Glassman & Stroud, plaintiffs' defense counsel on the sanctions

25 motion and appeal, withdrew from representing plaintiffs because

26 of differences with the clients and co-counsel, not because of

27 any actions by defendants.  (Ex. OOO.)  Further, as discussed

28 below, defendants did not ultimately have a duty to defend

1   plaintiffs against the sanctions motion.  Because plaintiffs do

2   not establish a causal relationship between defendants' actions

3   and the sanctions award against plaintiffs, the failure to defend

4   the sanctions motion cannot sustain a claim of bad faith.

5        Plaintiffs seek reimbursement for attorneys' fees

6   incurred defending against the offset in state court on appeal

7   after the cross-complaint had settled, but do not provide any

8   authority tending to show that this fell within defendants' duty

9   to defend against the cross-complaint.[9]  Plaintiffs also seek

10  future legal fees and costs resulting from defendants' failure to

11  defend against the offset, as well as future legal fees

12  associated with plaintiffs' efforts to protect their intellectual

13  property rights, but do not provide any factual foundation to

14  substantiate these claims.  As "damages which are speculative,

15  remote, imaginary, contingent, or merely possible cannot serve as

16  a legal basis for recovery," Piscitelli, 87 Cal. App. 4th at 989,

17  these assertions do not satisfy plaintiffs' burden of proving

18  they are entitled to relief on their bad faith claim.

19       Finally, plaintiffs' bad faith claim seeks additional

20  damages for emotional distress.  Emotional distress damages are

21  recoverable in bad faith cases "only when the insureds have

22  suffered a financial loss."  Waters v. United Servs. Auto. Ass'n,

23

---

24       [9]   Plaintiffs contend that defendants had a duty to fund
    the defense of all issues "reasonably related" to the cross-
25  complaint and argue that the offset was such an issue.  Safeway
    Stores, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 64
26  F.3d 1282, 1289 (9th Cir. 1995).  Safeway, however, does not
    stand for such a proposition, instead involving the apportionment
27  of defense costs between an uninsured corporation and its insured
    officers and directors.  Id.
28

1   41 Cal. App. 4th 1063, 1069 (2d Dist. 1996).  Such financial loss

2   must be "actual, not merely potential."  <u>Major v. W. Home Ins.</u>

3   <u>Co.</u>, 169 Cal. App. 4th 1197, 1214 (4th Dist. 2009).  Because

4   emotional distress damages are recoverable in bad faith cases

5   "only when the insureds have suffered a financial loss," <u>Waters</u>,

6   41 Cal. App. 4th at 1069, and the court has found that plaintiffs

7   have failed to prove a financial loss, plaintiffs are not

8   entitled to any damages for emotional distress.

9        Moreover, the court is not persuaded that Dr. Wallis or

10  any other plaintiff suffered emotional distress as a result of

11  any act or omission on the part of defendants.  Whatever

12  emotional distress Dr. Wallis may have suffered is just as likely

13  to have been caused by the prolongation of litigation, adverse

14  rulings received along the way, and the stress of litigation

15  itself.  Although Dr. Wallis testified at length regarding the

16  emotional distress she suffered as a result of Mendoza's

17  emotional distress during the litigation, there is no authority

18  for the proposition that a client may recover vicariously for the

19  emotional distress of her attorney.

20       In sum, plaintiffs have not shown that they suffered

21  any actionable harm, much less that defendants actually committed

22  bad faith by unreasonably withholding policy benefits.

23  Accordingly, because plaintiffs have failed to show by a

24  preponderance of the evidence that they are entitled to relief on

25  their bad faith claim, the court will enter judgment in favor of

26  defendants on that claim.[10]

27  _____

28       [10]   Because plaintiffs do not satisfy their burden of
    proving defendants unreasonably withheld policy benefits,

1    C.   Defendants' Counterclaim for Declaratory Relief

2         Defendants' counterclaim first seeks a judicial

3    determination regarding the reasonableness of plaintiffs' Cumis

4    counsel fees.  On April 15, 2009, the court granted "defendants'

5    motion to compel arbitration with respect to the amount of

6    attorney's fees allegedly owed to Cumis counsel."  (Docket No.

7    41.)  The court retained jurisdiction, however, "over issues not

8    squarely involving the calculation of Cumis counsel fees."  (Id.)

9    On June 25, 2010, the court reaffirmed this Order on plaintiffs'

10   motion for reconsideration, holding that the "mere fact that

11   plaintiffs' Complaint includes causes of action for bad faith and

12   breach of contract does not exempt the Cumis fee dispute from

13   section 2860 arbitration."  (Docket No. 121.)

14        Defendants' counterclaim for declaratory relief

15   regarding the reasonableness of plaintiffs' attorneys' fees fits

16   squarely within the court's previous order to arbitrate Cumis

17   counsel fees.  The question of reasonableness depends on the

18   arbitration ruling, and, absent a determination from the

19   arbitrator, the court cannot grant such relief.  Accordingly, the

20   court will enter judgment for plaintiffs on the counterclaim

21   regarding the reasonableness of plaintiffs' Cumis counsel fees.

22   D.   Defendants' Counterclaim Regarding Duty to Defend or

23        Indemnify Breach of the Protective Order

24        Defendants also seek a declaration that they had no

25   duty to defend or indemnify plaintiffs or Mendoza in connection

26

27   plaintiffs are not entitled to damages in the form of the
     expenses incurred seeking unpaid benefits under Brandt v.
28   Superior Court, 37 Cal. 3d 813 (1985).

1    with the breach of the protective order and subsequent sanctions.

2    Defendants seek reimbursement for fees and costs paid to

3    plaintiffs' counsel to defend against and appeal the sanctions

4    motion.

5            The Supreme Court of California has recognized that an

6    insurer that has provided a defense under a reservation of rights

7    "has a right of reimbursement that is implied in law as quasi-

8    contractual" for defense costs with respect to claims that "are

9    not even potentially covered" by the applicable policy.  Buss v.

10   Superior Court, 16 Cal. 4th 35, 50-51 (1997).  An insurer's right

11   to reimbursement is based on the law of restitution and "such a

12   right runs against the person who benefits from 'unjust

13   enrichment' and in favor of the person who suffers loss thereby."

14   Id. at 51.  Such "unjust enrichment" stems from "the insurer's

15   bearing of unbargained-for defense costs."  Id.  Defendants are

16   thus entitled to reimbursement if they can show by a

17   preponderance of the evidence that defendants paid certain fees

18   or expenses solely allocable to uncovered issues.  Id. at 53.

19           California Insurance Code section 533 states that "[a]n

20   insurer is not liable for a loss caused by the wilful act of the

21   insured."  Pursuant to this provision, "a court-imposed award of

22   sanctions under Code of Civil Procedure section 128.5, for bad

23   faith conduct or tactics in engaging in litigation which is

24   totally and completely without merit, cannot be shifted to that

25   litigant's insurer."  Cal. Cas. Mgmt. Co. v. Martocchio, 11 Cal.

26   App. 4th 1527, 1531 (1992).  Because such sanctions cannot be

27   shifted to an insurer by law, it follows that such a penalty is

28   "not even potentially covered" by an insurance policy.  Buss, 16

                                    32

1 | Cal. 4th at 50.

2 |         Here, plaintiffs and Mendoza were subject to court-

3 | ordered sanctions under section 128.5 to pay $43,678.00 jointly

4 | and severally.  Although plaintiffs and Mendoza dispute the

5 | sanctions and claim that the various state courts, including the

6 | discovery referee, trial court, court of appeal, and California

7 | Supreme Court, all ruled incorrectly, the underlying merits of

8 | the sanctions motion are immaterial for the purposes of coverage

9 | under section 533.  The question is not whether the actions of

10 | plaintiffs and Mendoza were in fact willful.  The question is

11 | whether, in order to impose sanctions, the trial court

12 | necessarily had to find that plaintiffs and Mendoza engaged in

13 | conduct proscribed the statute.  And, under Martocchio, it did.[11]

14 | 11 Cal. App. 4th at 1534 ("Such bad faith actions or tactics are

15 | . . . acts which are always intentional and wrongful and in which

16 | harm is always inherent as a matter of law.  They are patently

17 | 'wilful' acts for which insurance coverage is always proscribed

18 | by Insurance Code section 533 . . . .")  Because the sanctions

19 | order necessarily entailed a finding of conduct precluded from

20 | insurance coverage under section 533, plaintiffs were not even

21 | potentially covered under the policy, and defendants may seek

22 | reimbursement for costs expended in defending against the

23 | sanctions.  Buss, 16 Cal. 4th at 50.

24 |         Because Centennial and Atlantic Mutual had no duty to

25 |         [11]   Although Gumabao v. Gumabao, 150 Cal. App. 3d 572, 577

26 | (2d Dist. 1984) suggests that a court may impose sanctions under
section 128.5 for conduct that is not necessarily willful, the

27 | court finds the analysis of Martocchio controlling here, as that
case addresses specifically whether such sanctions can be covered

28 | by insurance under section 533.

1  defend against the sanctions motion, they are entitled to

2  reimbursement of the attorneys' fees and costs paid to defend

3  plaintiffs against the sanctions.  The evidence demonstrates that

4  defendants paid $115,995.90 to Mennemeier, Glassman & Stroud over

5  the course of the defense of the sanctions motion appeal.[12]  (Ex.

6  505.)  Therefore, defendants are entitled to a judgment of

7  $115,995.90 against plaintiffs on the counterclaim.

8         E.   Defendants' TPC Against Mendoza

9             Defendants' TPC seeks reimbursement from Mendoza for

10  sums the insurers expended defending Mendoza against the

11  sanctions motion.  Defendants concede, however, "that an insurer

12  may not obtain reimbursement for non-covered claims from defense

13  counsel under ordinary circumstances," but claim, without citing

14  any authority, that "these are not ordinary circumstances."

15  (Defs.' Resp. to Pls.' Trial Brs. at 26:22-25 (Docket No. 250).)

16  Further, the evidence shows that defendants expressed their

17  desire not to fund the defense of Mendoza on the appeal of the

18  sanctions order, (Ex. 254), and defendants have not demonstrated

19  ─────────────────────

20  [12]   Plaintiffs contend that defendants cannot seek damages
    for their counterclaim because defendants failed to list any

21  damages on their Rule 26 disclosures.  See Fed. R. Civ. P.
    26(a)(1)(A)(iii) (requiring, before trial, "a computation of each

22  category of damages claimed by the disclosing party")  The court
    has independently reviewed the evidence submitted on the issue of

23  attorneys' fees incurred during the sanctions appeal.  From those
    records the amount of fees paid by defendants to fund the

24  sanctions appeal can be readily determined with reasonable
    certainty.  Accordingly, the court finds failure to set forth the

25  amount in the Rule 26 disclosure harmless.  See Fed. R. Civ. P.
    37(c)(1) ("If a party fails to provide information . . . as

26  required by Rule 26(a) or (e), the party is not allowed to use
    that information . . . to supply evidence on a motion, at a

27  hearing, or at a trial, unless the failure was substantially

28  justified or is harmless.").

1   which, if any, payments made to Mendoza's firm supported this

2   work.  In fact, defendants concede that the "amounts paid by

3   Centennial are intertwined between the defense of [plaintiffs]

4   and [Mendoza], such that the legal fees and costs cannot

5   reasonably be allocated between either of them."  (Defs.' Trial

6   Br. at 26:13-15 (Docket No. 246).)  Accordingly, because

7   defendants failed to prove that Mendoza improperly received any

8   fees relating to her own defense against the sanctions motion,

9   they are not entitled to reimbursement and the court will ender

10  judgment in favor of Mendoza on the TPC.

11          For the foregoing reasons, JUDGMENT SHALL BE ENTERED in

12  favor of defendants on all of plaintiffs' claims; in favor of

13  plaintiffs on defendants' counterclaim for declaratory relief; in

14  favor of defendants and against Dr. Wallis, Mr. Wallis, and

15  Hygieia, jointly and severally, in the amount of $115,995.90 on

16  defendants' counterclaim for indemnity; and in favor of third

17  party defendant Mendoza on defendants' third party complaint.

18          The Clerk of the Court is instructed to enter judgment

19  accordingly.

20  Dated:  November 8, 2013

21  _____

22  WILLIAM B. SHUBB
    UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28